LAURA SMITH, *Admx., etc. v.* J. M. SLACK *et al.*

(No. 9434)

Submitted April 13, 1943. Decided June 8, 1943.

Fox, and LOVINS, JUDGES, dissenting.

*G. S. Millhouse,* for plaintiff in error.
*Kay, Casto & Amos,* for defendants in error.

Rose, Judge:

This action was instituted in the Common Pleas Court of Kanawha County by the administratrix of Henry A. Foss, to recover damages for his death allegedly caused or contributed by the wrongful acts of defendants. Upon the trial, at the conclusion of the plaintiff's evidence, the court on motion of defendants, excluded the evidence of the plaintiff, directed the jury to find a verdict for the defendants, thereafter overruled the motion to set aside said verdict and rendered a judgment of nil capiat. The Circuit Court of Kanawha County on petition for writ of error found that the judgment of the Common Pleas Court was plainly right, denied a writ of error, and this Court granted a writ of error to review the judgment of the circuit court.

The declaration alleges that the defendant, J. M. Slack, was the Sheriff of Kanawha County at the time of the incarceration of Foss in the county jail, and that the defendants, William Dyer and Robert Slack, were deputy sheriffs, Dyer being jailer and Slack assistant jailer.

The plaintiff's claim is that her decedent, while insane, was held in the county jail of Kanawha County, in custody of the sheriff and the two deputies, during which incarceration he was the victim of neglect, mistreatment and abuse which caused or at least contributed to his death.

If the evidence of plaintiff is not sufficient to support a verdict, had one been returned in her favor, the action of the court is without error. On consideration of such motion it is the duty of the trial court to consider all inferences which the jury could justifiably draw therefrom. *Estep* v. *Price*, 93 W. Va. 81, 115 S. E. 861; *Jameson* v. *Norfolk & W. Ry. Co.*, 97 W. Va. 119, 124 S. E. 491; *Fischer* v. *Clark*, 110 W. Va. 420, 158 S. E. 504; *Lewis* v. *State Automobile Mutual Ins. Co.*, 115 W. Va. 405, 177 S. E. 449.

The duties of the sheriff as jailer of the county are well defined by Code, 7-8-2, in the following pertinent language: " * * * He shall keep the jail in a clean and sanitary condition, and shall furnish each prisoner with

wholesome and sufficient food, and with clean and sufficient bedding. The jail shall be heated when proper. When any prisoner is sick the jailer shall see that he has adequate medical attention and nursing, and so far as possible keep him separate from other prisoners. A failure on the part of the jailer to perform any of the duties herein required with respect to any prisoner in his jail shall be a contempt of any court of record under whose commitment such prisoner is confined, and shall be punished as other contempts of such court". The duties thus imposed are ministerial, involving no discretion on the part of the jailer, and imposing a liability for the nonperformance or the negligent performance thereof. *Clark v. Kelly,* 101 W. Va. 650, 133 S. E. 365, 46 A. L. R. 799; *State v. Conley,* 118 W. Va. 508, 190 S. E. 908.

In order properly to appraise the question at issue, a detailed recital of the evidence is proper. Foss, residing in Akron, Ohio, was in Charleston engaged in the business of photographing customers of merchants for advertising purposes. He was a guest at the Lincoln Hotel. On the evening of May 2, 1938, the manager of the hotel met Foss on the street and talked with him, at which time Foss asserted that he expected to acquire great wealth. About seven o'clock of the same evening, he saw Foss at the Lincoln Hotel, where he was talking to some men about his possession of great wealth and was detailing large schemes for improving parts of the city. Foss was not violent, but the manager of the hotel, fearing that he would become so, called a city policeman who persuaded Foss to accompany him under the pretense of finding a larger audience. The policeman, in fact, took Foss to the county jail, where he was incarcerated and detained until his death on May 16, 1938.

Upon Foss's being confined in the county jail, the manager of the hotel wired his wife to come to Charleston, which she did. She made an effort to see her husband but was not permitted to do so, and, being in straitened financial circumstances, she returned to Akron, Ohio, to arrange for his transfer to that place, and did not return

until after the death of her husband. At the time Foss was placed in the jail he weighed approximately one hundred sixty-five pounds; at the time of his death one hundred thirty pounds. On examination of the body after his death, it was found that he had a bruise on his neck and abrasions on the side of his face, and that he was very much emaciated.

Vincent Elkins, a "trusty" in the jail, on a charge of larceny, testified that Foss was first put in a padded cell and later transferred to another part of the jail; that he was naked during the time; that his cell was dirty; that the bed of the cell worked on hinges on the side of the cell wall, and was tied up so that he could not get it down; that Foss was required to sleep on the wet floor, although the witness says he never saw Foss lying on the floor; that when the witness first saw Foss he weighed around one hundred sixty-five pounds; that on one occasion he saw Foss's hands tied on the outside of the bars of the cell, at which time Foss was naked. Elkins further testified that there was a bad odor in the cell where Foss was confined, and further that he never saw a doctor in Foss's cell except the one who examined Foss to determine his mental condition. However, the opportunities of this witness for close examination and observation of the cell were not good.

Raymond Miller, another inmate of the jail during the time Foss was confined therein, states that the condition of the cell where Foss was confined was bad; that there was a dirty mattress on each bed or "bunk"; that Foss did not have any place to lie down during the day, the "bunk" being fastened up on the wall, for the reason that Foss was accustomed to "banging the bunks, making noise"; that he saw Foss lying on the floor and that the floor was damp; that the weather was cold during the time Foss was in jail; that Foss was naked and shivering; that he refused to eat and apparently had a fever before he died; that three or four days before Foss died the witness called for a doctor several times; and that on the morning Foss died he was sitting on the commode, looking pale,

whereupon witness told the jailer that there was no use to call a doctor, but to call an undertaker.

Herbert Romberg, another inmate of the county jail, testified that Foss used the floor of his cell for a toilet, taking water from the commode and throwing it on the floor; that he made noise with the bunks and that Jack King and Rufe Clark tied the bunks up, after which they were never let down; that the cell were Foss was located was cold, the witness using two blankets in his own cell; that Foss ate very little; that he was served beans and cornbread and sometimes a slice of white bread; that the food was not good; that Foss was free except one time when he was tied to the bars of his cell; that he was always dipping water out of the commode and drinking it; that the witness and Raymond Miller both tried to get a doctor three or four days before Foss died; that they found Foss dead sitting on the commode, whereupon they called the jailer, who directed the removal of his body from the cell. The undertaker who embalmed the body of Foss testified that he recalled no evidence of bruises on his body.

During the time Foss was confined in jail the temperature in the City of Charleston, at a point other than the jail, from May 2 until May 16, showed a maximum temperature ranging between 89 and 62° Fahrenheit, and minimum temperatures ranging from 37 to 60° Fahrenheit.

Dr. J. Hudson Robinson, a physician and surgeon, engaged in the general practice of medicine, testified as an expert to a hypothetical question only, not having examined the patient, that having regard to Foss's age, his mental condition, his refusal to eat, and the condition of his confinement in the jail, his death possibly resulted or was hastened by such conditions of his confinement.

The statement of the trial judge upon his sustaining the motion to direct a verdict for the defendants is in the record and is as follows:

"The Court sustains the motion. It is the opinion of the Court that the burden is on the plain-

tiff to prove that the death of the decedent resulted from the treatment which he received at the hands of the defendants, and that they have failed in carrying that burden. A mere possibility that this treatment caused the death is not sufficient and is not even prima facie. For that reason, the Court feels it its duty to instruct the jury to find a verdict for the defendants."

It thus appears that the court's action was based on the assumption that, since the only physician who testified went no further than to say that it was "possible" that the death resulted from the wrongful acts testified to by the plaintiff's witnesses, the case failed. This holding would have been entirely correct if there was in the case no other competent evidence of the cause of death. *Hayzlett, Admr'x.* v. *Westvaco Chlorine Products Corporation,* 125 W. Va. 611, 25 S. E. 2d 759, decided by this Court May 11, 1943.

But expert evidence is not always necessary to prove the cause of death. Courts and juries may take into consideration the facts with which all mankind are familiar. It would not be necessary to call an expert to advise a jury of the cause of death where it appears without dispute that the decedent was blown to pieces by an explosion of dynamite, or had been run over by a train, or had been shot through the head with a pistol. Common knowledge and common sense do not depart from a man upon his entering a jury box.

As the record now stands, the defendants are shown to have neglected and mistreated the deceased grossly. The statutory duty of the sheriff to the decedent is plain and imperative. If the evidence in the record is to be believed the defendants did none of the things required by the statute. The decedent was unquestionably sick; other prisoners could recognize this fact and repeatedly requested the jailer to procure a doctor for him but none was ever furnished. This sick man was supplied only with the coarse, regular food of well prisoners, of which he ate but little and infrequently. His cell was not kept

heated or sanitary; filth and excreta accumulated and was only partly removed, the window being kept open day and night to relieve from the stench. He was continually unclothed day and night, while the temperature was such at times as to require a normal prisoner to sleep under two blankets. He had no medical attention or nursing whatever. Because he made noise with his cot, trusties tied and kept it against the wall, so that it could not be used. A "kangaroo court" on at least one occasion tied his arms to the bars of the cell in order that he might not make a noise. He came into jail physically in good condition, weighing 165 pounds. At the end of fourteen days he was dead, weighing only 130 pounds. No cause of death other than his neglect and abuse by the defendants is shown by the evidence.

Can we say that the jury, as men of average sense, would not be able to find any causal connection between the conditions under which this man was confined and his death? Would they not know, aside from the opinion of any witness, expert or lay, that such exposure, deprivation and abuse would inevitably affect the physical body of any victim, and, whether the sole cause of his death, would necessarily weaken and injure him so that he would be more susceptible to death from any subsequent cause? Direct testimony, expert or otherwise, is not always necessary to prove the causal connection between the negligence or wrong of a tortfeasor and the injury suffered by his victim. Circumstantial evidence may be sufficient. *Willis* v. *Norfolk and Western Railway Company*, 96 W. Va. 646, 123 S. E. 585; *Robertson* v. *Weingart*, 91 Cal. App. 715, 267 P. 741; *Boles* v. *Hotel Maytag Company*, 218 Iowa 306, 253 N. W. 515; *City of Ludlow* v. *Albers*, 253 Ky. 525, 69 S. W. 2d 1051; *Nealis* v. *Chicago R. I. & P. Railway Company*, 173 Minn. 587, 218 N. W. 125; *State ex rel. City of St. Charles* v. *Haid*, 325 Mo. 107, 28 S. W. 2d 97. *Westerdale* v. *Northern Pacific Railway Company*, 84 Mont. 1, 273 P. 1051; *City of Longmont* v. *Swearingen*, 81 Colo. 246, 254 P. 1000. Medical or other expert testimony is not a requisite in such cases. The

jury, we think, could have concluded from the testimony adduced, if believed, that the treatment and neglect to which the decedent was subjected caused, or contributed to, his death. The medical witness stated expressly that this was "possible", but declined to say it was probable, for the reason, as he says, that he did not know. Even if this witness had clearly and distinctly testified that there was no possible connection between the decedent's treatment and his death, his testimony would not have annihilated the other evidence. He would simply have been one witness whose evidence was to be considered; the other evidence would still have remained for the jury to appraise. Expert testimony does not destroy other competent evidence, nor necessarily control it. *Ward* v. *Brown,* 53 W. Va. 227, 44 S. E. 488; *Bowen* v. *City of Huntington,* 35 W. Va. 682, 14 S. E. 217; *The Conqueror,* 166 U. S. 110, 17 S. Ct. 510, 41 L. Ed. 937.

We observe that there is not in the record any clear and direct evidence of the official character of the defendants. No point is made of this fact in brief or argument. Presumably the defendants in error consider the record sufficient on this point. The defendants, Robert Slack and William Dyer are spoken of by witnesses who were inmates of the jail as deputy sheriffs and jailers, and as exercising authority about the jail. The defendant, J. M. Slack, is merely shown to have been in and about the office of the jail. Clearer evidence that the defendants were sheriff and deputy sheriff, respectively, would have been advisable. But a court may take judicial notice of its own officers. *State* v. *Citizens' Trust and Guaranty Company,* 72 W. Va. 181, 77 S. E. 902; *Central Land Company of West Virginia* v. *Calhoun,* 16 W. Va. 361; *Dyer* v. *Last, Adm'r.,* 51 Ill. 179; *Norvell* v. *McHenry,* 1 Manning (Mich.) 227; *Bloch* v. *Crumpacker,* 44 Ind. App. 171, 88 N. E. 875; *Ames Evening Times* v. *Ames Weekly Tribune,* 183 Iowa 1188, 168 N. W. 106. This rule has been applied directly to sheriffs. *Casey* v. *Bryce,* 173 Ala. 129, 55 So. 810; *Thielmann* v. *Burg,* 73 Ill. 293; *Slaughter* v. *Barnes,* 3 A. K. Marshall (Ky.) 412, 13 Am. Dec.

190; *Burrow* v. *Brown,* 59 Tex. 457; *Martin* v. *C. Aultman & Co.,* 80 Wis. 150, 49 N. W. 749. We are not disposed, therefore, to hold the evidence on behalf of the plaintiff insufficient because of its failure to show more directly that the defendants were sheriff and deputy sheriffs, respectively.

The evidence on behalf of the plaintiff made a prima facie case, and should not have been stricken. The judgment of the Circuit Court and that of the Court of Common Pleas are reversed, the verdict of the jury is set aside and a new trial is awarded the plaintiff.

*Reversed; new trial awarded.*

LOVINS, JUDGE, dissenting:

The insufficiency of the evidence to support a verdict in favor of the plaintiff, had such been returned, and the unwarranted extension of the rule relative to judicial notice are the reasons for my disagreement with the majority.

The treatment accorded Henry A. Foss while he was confined in jail cannot be condoned, and if such treatment caused or hastened his death, the persons responsible therefore should be held liable in damages. It is stated in the majority opinion that no cause of Foss's death other than neglect and abuse by defendants is shown, to which statement I will add that it does not appear from the evidence that anything which occurred while Foss was confined in jail caused or hastened his death. Nevertheless, it is reasoned in the majority opinion that a contributing cause of Foss's death may be inferred from the result. This is an innovation on the time-honored process of reasoning from cause to effect. The causes of death are many and varied. Injuries and mistreatment which would cause or hasten the death of an infant or a person in delicate health may have little or no effect on a person of great stamina or more robust physical condition. The record is silent as to what disease or casualty caused Foss's death. It may be ad-

mitted that he was mentally deranged, but it does not follow that his physical condition was poor or that he lacked the hardihood to withstand the hardships said to have been imposed on him while confined in jail. Owing to the diversity of facts which appear in legal controversies, an erroneous evaluation thereof in one instance does not establish a rule of law generally applicable to subsequent litigation. But there are certain principles of law extant in this State precluding submission of a case to the jury where the plaintiff fails to make a·*prima facie* case. The "scintilla rule", if ever accepted in this jurisdiction, has long since been disapproved by this Court. *Kiern* v. *McLaughlin,* 121 W. Va. 30, 1 S. E. 2d 176; *Ketterman* v. *Railroad Co.,* 48 W. Va. 606, 37 S. E. 683. Judge Brannon in a very able and convincing opinion in the *Ketterman* case stated that evidence from which a surmise of negligence may be made is insufficient to take the case to the jury. By the same principle a surmise as to the cause or contributing cause of death in an action for death by wrongful act is insufficient to take a case to the jury. A mere scintilla of evidence is insufficient to support a verdict. *Hicks* v. *New River Coal Co.,* 95 W. Va. 17, 120 S. E. 898. If the evidence is insufficient to support a verdict, the defendant is entitled to a directed verdict. *Ice* v. *County Court,* 77 W. Va. 152, 87 S. E. 75; *Cobb* v. *Glenn Boom & Lumber Co.,* 57 W. Va. 49, 49 S. E. 1005, 110 Am. St. Rep. 734. Bad treatment of Foss is shown, but that alone is insufficient to show that his death was hastened or caused thereby. I think that the evidence connecting the death of Foss with his treatment while confined in jail hardly rises to the level of scintilla evidence; hence the trial court properly directed a verdict for the defendants.

The declaration· in this action alleges that during the period of incarceration of Foss in the· county jail, the defendant, John Mark Slack, was the duly elected and qualified Sheriff of Kanawha County, and that William Dyer and Robert Slack were two of his deputies, appointed with the consent of the county court and duly

qualified. Should these allegations be unfounded in fact, no liability would attach to the defendants herein, their duties to Foss devolving upon them by reason of their official capacity. As indicated in the majority opinion, the evidence adduced on this point should have been clearer and more direct. In order to supply this defect, it was necessary to resort to judicial notice. Judicial notice may be divided into that authorized by statute and that authorized by common law, the latter being invoked here. The basis of common law judicial notice is that the facts so noticed are so generally well known to the average man that proof of their existence is deemed unnecessary. Thus it is generally held that the court must take judicial notice of the sheriff of the county in which the court is sitting, the reason being that the sheriff is elected by the people and holds a high county office, and is, therefore, generally known throughout the county in which he is elected. But this is not true of deputy sheriffs who are appointed by the sheriff with the consent of the county court, and may be removed by the sheriff or said court at any time. Code, 6-3-1,2. A sheriff also may remove a deputy sheriff by filing with the clerk of the county court a statement in writing showing such action. Code, 7-7-7, as amended by Chapter 19, Acts of the Legislature, 1939. In the case of *Slaughter* v. *Barnes,* 3 A. K. Marshall, Ky. 413, cited in the majority opinion, the following language appears: "But it is contended that as the sheriff is a public officer he must be presumed to be known as such without any express proof to that purpose. This may be true as to the principal sheriff, but it cannot be so as to the deputy, for he is not appointed and commissioned in the same public manner as the sheriff. His appointment is made and revoked at the pleasure of the sheriff, and he who is a deputy to-day may not be so to-morrow." It is not a matter of general knowledge even to the citizens of a county as to the identity and number of deputy sheriffs. Especially is this true in the more populous counties of this State. The identity of appointees as deputy sheriffs is not a matter of general notoriety,

and, in my view, is not such that judicial notice should be accorded thereto. When a fact is judicially noticed by this Court it becomes incumbent on the various trial courts likewise to take cognizance thereof. Infrequently are judges familiar with the names and identities of deputy sheriffs within the county, yet without proof they are told they must judicially know the identities of such deputies. Thus it may occur that a trial judge will find himself in a position in which he must acquire special knowledge in order to take judicial notice. Though this is often the case with judicial notice authorized by statute, it should not be so as to judicial notice authorized by common law. The litigants here are relieved of the duty of proving a material part of their cause of action and the burden is cast upon the trial judge to acquaint himself with such facts on his own initiative. In the instant case the record fails to show adequately the official capacities of two defendants, and there is nothing appearing in the record from which it may be inferred that the trial court took notice of the same. Were it not for the fact that the trial court gave reasons for directing a verdict and the same were made a part of the record, this Court on writ of error would not have known the reasons for the directed verdict, and it might well have been that the verdict was so directed for the very reason that the record is devoid of a showing of the official capacities of the defendants. A trial court and this Court may take judicial notice of the office of sheriff and the person holding the same, but I do not believe this rule should be extended to include deputy sheriffs. The cases of *Central Land Company of West Virginia* v. *Calhoun,* 16 W. Va. 361, and *State* v. *Trust Co.,* 72 W. Va. 181, 77 'S. E. 902, cited in the majority opinion are authority for the proposition that judicial notice may be taken of the office of clerk of the county court, and the signature of the person holding the same when a paper was before the trial court, signed by the person who actually holds that office, or by a deputy clerk. In this case the trial court had no paper before it from which it might be in-

ferred that any of the defendants claimed to hold the office of sheriff or deputy sheriff. In the cases of *Land Co.* v. *Calhoun, supra,* and *State* v. *Trust Co., supra,* official papers were before the Court, an indorsement in one instance and an attestation in the other, signed by persons claiming to hold the office of clerk of the county court. This fact at least afforded a reasonable basis on which judicial notice could be grounded. When we reach into the unknown and take therefrom a supposition and dress it in the habiliments of fact, only confusion and uncertainty can result.

I would affirm the judgment of the Circuit Court of Kanawha County.

I am authorized to say that Judge Fox joins in this dissent.