LARRY MOSS, Plaintiff-Appellee and Cross-Appellant and Separate Appellant, v. TIMOTHY MILLER, Defendant-Appellant and Cross-Appellee (Everett Gibbens *et al.*, Defendants-Separate Appellees).

Fourth District   No. 4—92—0788

Argued October 20, 1993.—Opinion filed December 22, 1993.—
Rehearing denied January 26, 1994.

176

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and John A. Morrissey, Assistant Attorney General (argued), of Chicago, of counsel), for appellant and for appellee Everett Gibbens.

William C. Zukosky (argued), of Urbana, and Edward Zukosky, of Wenona, for appellee Larry Moss.

Richard E. Stites and Kevin W. Brennan, both of Livingston, Barger, Brandt & Schroeder, of Bloomington, for appellee Raspal Dalal.

JUSTICE LUND delivered the opinion of the court:

Plaintiff Larry Moss, an inmate of Pontiac Correctional Center (Pontiac), was beaten by other inmates and received medical care from defendant correctional physicians Everett Gibbens and Raspal Dalal, as well as from defendant optometrist Timothy Miller. This medical malpractice action was based upon the failure to refer plaintiff to an ophthalmologist, which allegedly delayed the discovery of an orbital fracture, or blow out, under the left eye. The result was that his left eye permanently looks upward and outward, and he suffers from double vision.

After a jury trial, a verdict was entered only against Dr. Miller, awarding damages of $75,000, but the jury reduced the award by 30%

based upon comparative negligence. Plaintiff contends the trial court erred (1) in denying his motion for judgment *n.o.v.* or, in the alternative, a new trial; (2) in directing verdicts to all of plaintiff's counts except that of a negligent failure to refer; (3) in restricting plaintiff's cross-examination of defendants' expert witness; (4) in instructing the jury as to the standard of care; (5) in refusing to allow plaintiff's treating physician to express an opinion regarding Dr. Gibbens and Dr. Dalal; and, finally, (6) whether remarks made by defense counsel during closing arguments were so prejudicial as to require a new trial.

Dr. Miller contends the trial court erred in (1) striking defendants' affirmative defenses based upon sovereign immunity; and (2) in refusing to grant his motion for a new trial based upon the trial court's error in allowing two ophthalmologists to testify to an optometrist's standard of care.

Plaintiff cross-appeals against Dr. Miller, contending the trial court erred in denying his motion for judgment *n.o.v.* or, in the alternative, *additur*, where the damages awarded were inadequate as a matter of law and there was insufficient evidence to justify the comparative negligence offset.

## FACTS

On February 29, 1984, plaintiff Larry Moss was attacked and beaten by several fellow inmates at Pontiac. He was examined initially by defendant Dr. Raspal Dalal, who noted a variety of bruises and the fact that plaintiff's eyes were swollen shut. Dr. Dalal ordered a series of X rays, specifically requesting X rays of both eye orbits to rule out the possibility of an orbital fracture. (An orbital fracture, or "blow-out fracture," occurs when blunt trauma to the eye tissues causes the bony structure of the eye socket (orbit) to rupture.) Dr. Dalal also ordered that plaintiff be referred to the prison eye clinic.

On March 1, 1984, plaintiff was examined by the next physician on shift, Dr. Everett Gibbens. Dr. Gibbens' plan was to continue observation of plaintiff's condition. Plaintiff was already scheduled to see the prison optometrist, defendant Timothy Miller, on the following day. Dr. Gibbens testified that he knew plaintiff had suffered serious injury around his eyes, sufficient to create the possibility of a blow-out fracture. He was also aware that the swelling of the tissue surrounding the eyes could have obscured signs of a fracture in the X rays taken the day before. Even so, no new X rays were ordered. The radiologist who reviewed plaintiff's X rays testified that if he had had a question regarding the condition of plaintiff's orbits, he would have requested additional X rays.

On March 2, 1984, Dr. Miller examined plaintiff and found that plaintiff could not open his left eye enough to have the retina (fundus) examined. Dr. Miller testified that whenever a person is badly beaten around the eyes, the possibility of a blow-out fracture is a consideration. He did not consider that plaintiff had a blow-out fracture, because there was no diplopia (double vision), no enophthalmos (eye sinks down into socket), and no X rays showing a fracture. Whether defendant had diplopia (double vision) was impossible to tell until he was able to use both eyes. He scheduled another appointment for Dr. Miller's next shift on March 5, 1984.

On March 5, 1984, Dr. Gibbens examined plaintiff and noted that he had ecchymosis (a form of large bruise) and eye muscle damage. He noted that plaintiff should be referred to an ophthalmologist if Dr. Miller concurred. Dr. Miller examined plaintiff the same day and noted plaintiff's complaint of double vision for the first time. Dr. Miller concluded that plaintiff's condition warranted observation, but found no need for referral to an ophthalmologist.

The following day, March 6, 1984, Dr. Gibbens called Dr. Miller at his home to discuss Moss' condition. Dr. Gibbens learned that Dr. Miller had examined plaintiff before his injury, in December 1983, and found exotropia in the left eye (permanent deviation of the eyeball toward the outside). Testimony was heard that the degree of deviation observed in 1983 was considered slight (three prism diopters), while the degree of deviation found on March 5, 1984, was very significant (in the 20-diopter range). Plaintiff contends that on March 6, 1984, he was able to look in the mirror and tell that something was very wrong with his left eye. He said it was not only deviating outward, but also upward. He allegedly complained about this to both doctors.

On March 7, 1984, Dr. Dalal examined plaintiff for the second and last time. He reviewed the X-ray report, which found no sign of an orbital fracture, and noted plaintiff's medical record which contained a reference to plaintiff's preexisting exotropia and the fact that Dr. Miller would follow up the next day and refer to an ophthalmologist if no progress was noted. Dr. Dalal's own examination of plaintiff revealed that he had improved markedly. Although he could not see well when he was using both eyes and had blurred vision, the swelling had gone down and overall he felt better. Since Dr. Miller was the only person to have observed plaintiff's preexisting eye deviation, Dr. Dalal reasoned that Dr. Miller would be in a better position to determine whether his present deviation was related to the same problem exhibited prior to the beating.

At his next examination on March 8, 1984, Dr. Miller observed that while plaintiff still reported double vision, the left eye was improving dramatically. He suggested eye exercises, a patch over the eye, and indicated that plaintiff should return on a weekly basis for follow-up treatment. Dr. Gibbens also examined plaintiff on March 8, 1984. He concluded that ongoing observation by Dr. Miller was necessary, but saw no red flag to indicate plaintiff had suffered an orbital fracture. Gibbens noted on plaintiff's medical record that he exhibited vertical and lateral phoria (eye deviated upward and outward), but patient had no complaints. He also noted that Dr. Miller felt the patient could safely be followed as his phorias were improving and Dr. Miller would see plaintiff again next week.

Dr. Gibbens testified that plaintiff's diplopia had, by this time, exhibited dramatic improvement. He based this observation entirely upon Dr. Miller's note saying there was improvement. He took no measurements to confirm Dr. Miller's conclusion. When asked whether he was aware of plaintiff's hypertropia (eye pointing up), Dr. Gibbens responded that he was indirectly aware of this, but his precise thinking at the time was that the eyes were simply not tracking together.

Dr. Gibbens discharged plaintiff from the prison hospital on March 8, 1984, with the notation that he return on sick call for reexamination. Neither Dr. Gibbens nor Dr. Miller wrote any order for a return appointment on the "physicians orders" form. Plaintiff contends he was never aware of any improvement in his double vision and, after being discharged to the cell block, he found he was unable to walk without the eye patch on. He claims he told Dr. Miller he had not improved.

Dr. Miller next examined plaintiff on March 26, 1984. Based upon notes in plaintiff's medical record, Dr. Miller expected that plaintiff would have been examined on a weekly basis. However, Dr. Miller had not arranged any appointments between March 8 and 26, 1984. On March 26, 1984, he observed that plaintiff was unable to depress the left eye or bring it down past midpoint. Although he still did not consider it an emergency, Dr. Miller filled out a referral form for plaintiff to be seen by an ophthalmologist at the Gailey Eye Clinic (Gailey) in Bloomington, Illinois. Dr. Miller did not see plaintiff again until a chance meeting in a prison hallway on April 29, 1984, when he learned from plaintiff that he had not yet seen an ophthalmologist. He immediately went to the department responsible for these referrals and reiterated his request.

On May 10, 1984, plaintiff was sent to Gailey, where he was examined by Dr. Lockhart. His initial diagnosis revealed that plaintiff's left eye had lost about 50% of its ability to look down and was turned outward 25% of the way from straight ahead. He was immediately suspicious of a blow-out fracture and ordered X rays. Subsequently, a tomogram confirmed the existence of the blow-out fracture.

Dr. Lockhart performed eye surgery on plaintiff on July 18, 1984, and discovered a significant hole in the orbital floor, with considerable orbital tissue protruding down through the hole into the maxillary sinus. Plaintiff underwent surgery three more times to correct the deviation in his left eye. Although his condition has improved, plaintiff still has double vision today and, in the opinion of plaintiff's experts, the condition is permanent.

Dr. Lockhart testified that plaintiff's condition might have been less severe had he been referred to an ophthalmologist at an earlier date. Citing the manual published by the Academy of Ophthalmologists, he identified the 14-day period following the injury as being an important period of time in the treatment of these injuries. He also conceded that treatment of orbital fractures is a controversial topic and that some doctors will not operate for four to six months after the injury, if at all.

Plaintiff's case was tried on the theory that defendants violated the requisite standard of care in not recognizing earlier that plaintiff's condition warranted the expertise of a specialist and failing to make a prompt referral to that expert.

## JUDGMENT N.O.V.

■ While we find sufficient evidence at trial to sustain a finding that Dr. Gibbens and Dr. Dalal should have been on notice of an eye injury requiring referral to a specialist, the evidence is not so overwhelming as to fall under the standard expressed in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504. Nor was the verdict unreasonable or arbitrary.

## SOVEREIGN IMMUNITY

■ Dr. Miller and Dr. Gibbens contend that under the doctrine of sovereign immunity, the Court of Claims has exclusive jurisdiction over plaintiff's tort action. The duties the State-employed physicians allegedly breached were those every physician owes one's patient, rather than obligations incurred solely by virtue of holding a public office. Therefore, sovereign immunity did not attach. *Kiersch v. Ogena*

(1992), 230 Ill. App. 3d 57, 62-63, 595 N.E.2d 696, 700; *Cottrill v.* *Russell* (1993), 253 Ill. App. 3d 934, 940.

## DIRECTED VERDICT COUNTS

The trial court directed verdicts as to all plaintiff's counts, except that of negligent failure to refer plaintiff's treatment to a specialist. One of the dismissed counts was based upon a "concert of action" theory which was recognized (but found not to exist) in *Reed v. Bascon* (1988), 124 Ill. 2d 386, 530 N.E.2d 417. No general rule or definition is adopted in *Reed*, but the supreme court implied there must be evidence of control between or among those treating the patient.

■ In the case at hand, there were at least 8 to 10 different physicians on rotation at the prison. Each physician was responsible for care of only those patients on his shift, and any follow-up would be determined by a random draw of the physician who happened to be on the next shift. The subsequent physician would take over care of the patient, and the original physician might never see the patient again. No doctor controlled the actions of the physician who followed him or her, and the subsequent physicians had no control over the initial physician. We refuse to recognize the concert of action theory as it related to the facts in this case. To suggest all those treating plaintiff (including defendants) were working in concert based upon scanty evidence of cooperation and control would be folly.

■ Next, plaintiff contends the trial court erred in directing verdicts on allegations that Dr. Dalal and Dr. Gibbens were negligent (a) in failing to appreciate the urgency and serious nature of plaintiff's left eye medical condition; (b) in failing to timely evaluate, recognize, suspect, or diagnose a blow-out fracture; (c) in failing to exercise due diligence and give plaintiff all necessary care as long as plaintiff's condition required attention; and (d) in referring and deferring to Dr. Miller to make decisions in regard to plaintiff's medical condition. Plaintiff contends each of these allegations was implicit within Dr. Gary Price Todd's testimony that Dr. Dalal and Dr. Gibbens negligently failed to timely refer to a specialist.

It seems clear that allegations (a), (b), and (c) are merely cumulative of the allegation that defendants failed to timely refer to a specialist, and that (d), negligent deferral to an optometrist to make a medical decision regarding an eye injury, was not established by the evidence. Plaintiff's own expert, Todd, recognized the value of Dr. Miller's opinion and stated that it was within the standard of care to seek his opinion.

Evidence presented justified instruction of only one issue—negligent failure to refer to a specialist. The trial court did not commit error in directing the verdicts.

## CROSS-EXAMINATION OF EXPERT

■ Plaintiff contends the trial court erred in sustaining objections to plaintiff's cross-examination of defendants' expert, Dr. Edward Colloton. The court sustained objections to plaintiff's questions regarding whether optometrists can treat eye injuries, the scope of practice of an optometrist, the standard of care for prison doctors as opposed to those practicing in the community, the standard referral pattern in referring a patient with serious eye injuries, and who would be qualified to evaluate the nature of a misalignment of the eyes. Our review of Dr. Colloton's testimony indicates the trial judge's rulings were, for the most part, well-founded. Dr. Colloton offered no testimony on direct examination regarding optometrists, the standard of care inside a prison, or the referral pattern in treating eye injuries. Plaintiff's inquiries on these matters were clearly beyond the scope of direct examination.

However, at one point plaintiff's counsel was able to elicit testimony from Dr. Colloton that a patient suffering from diplopia and hypertropia has suffered a significant, serious injury to the eye. Dr. Colloton was then asked what should be done about these injuries. He responded that an assessment of the health of the eye needed to be done, and he believed this had been done in the case at hand. He then stated that an evaluation must be made regarding the misalignment of the eyes. Plaintiff's counsel asked who should do this evaluation, but the trial judge sustained an objection to this question as being outside the scope of direct examination.

Defendants contend the question has not been preserved for review because plaintiff failed to make an offer of proof. If a question is in proper form and clearly admits of an answer relative to the issues, the party by whom the question is propounded is not bound to state facts proposed to be proved by the answer unless the court requires him to do so. An offer of proof is not necessary where the question shows the purpose and materiality of the evidence. *People v. Lynch* (1984), 104 Ill. 2d 194, 202, 470 N.E.2d 1018, 1021.

Cross-examination of a witness should be confined to matters brought out on direct examination. (*Muscarello v. Peterson* (1960), 20 Ill. 2d 548, 170 N.E.2d 564.) The supreme court stated in *Muscarello* that in regard to expert witnesses, wide latitude should be granted on cross-examination to fully test the expert's opinions and his bases

therefore. (*Muscarello*, 20 Ill. 2d at 553, 170 N.E.2d at 568.) Dr. Colloton is an ophthalmologist and was retained by defense counsel to offer expert testimony on the subject of the treatment of eye injuries. The trial court abused its discretion in denying plaintiff an opportunity to ask Dr. Colloton who should be responsible for evaluation of the misalignment of the eyes. While it was error, this alone does not justify reversal. We do not anticipate a repeat of the problem on retrial.

## CLOSING ARGUMENT

■ Next, plaintiff contends the remarks made by defense counsel during closing argument were so prejudicial that plaintiff is entitled to a new trial. Our review of these remarks reveals nothing so prejudicial as to deprive plaintiff of a fair trial. The one exception is a remark by counsel for Dr. Dalal that Dr. Lockhart had no criticism of Dr. Dalal. Counsel had earlier stipulated that he would not comment on this fact. Unfortunately, plaintiff failed to object at trial and did not raise the contention in his post-trial motion. The issue is waived. *People v. Berry* (1984), 99 Ill. 2d 499, 503, 460 N.E.2d 742, 744.

## JURY INSTRUCTIONS

■ The trial court instructed the jury on the standard of care, using Illinois Pattern Jury Instructions, Civil, No. 105.01 (3d ed. 1992) (hereinafter IPI Civil 3d), stating that a doctor must possess and apply the knowledge, skill, and care ordinarily used by a reasonably well-qualified doctor of medicine *practicing in the same or similar localities* under the circumstances similar to those shown by the evidence. An instruction was also given for the standard of care used by an optometrist. The phrase "practicing under the same or similar localities" is optional in the instruction, and the notes on this instruction state that it may be appropriate to delete this phrase if there is no issue in the case of an applicable local practice or the conditions and facilities available in the locality in question. Over plaintiff's objection, the trial court gave defendants' instructions Nos. 10 and 11, which included the optional phrase and refused plaintiff's instructions which had deleted the phrase. Evidence at trial established a nationwide standard of care in the referral of serious eye injuries to a specialist.

If it has not already been recognized, we now hold that those practicing the medical arts in the penitentiary are held to the same standard of care as those practicing in the communities of our State. To hold otherwise would be to abandon reason and common sense.

However, we recognize constraints necessarily exist in correctional institutions which may well have a negative effect on the ability to deliver medical services. For instance, the limitations on direct referrals could interfere with correct treatment at no fault of the physicians or optometrist. Such an example is provided by the delay after Dr. Miller made the request for referral. The medical arts practitioner should not be held liable for injuries resulting from these constraints. However, those types of constraints, while interfering with proper medical care, do not lessen the standards required of the medical arts practitioner.

By including the "locality" phrase in the jury instructions on the standard of care, the trial court implied that the jury could draw a distinction between medical decisions made in a prison setting and those made in the community just outside its walls. This implication was seized upon by both defense attorneys in closing arguments, where they repeatedly stressed that the jury must not lose sight of the fact that plaintiff was being treated in a prison hospital. Counsel for Dr. Dalal stated that in order for plaintiff to prevail, he must prove that Dr. Dalal did not use "the ordinary care of a physician practicing in a similar setting, in other words the prison." Counsel for Dr. Gibbens and Dr. Miller attacked the credibility of plaintiff's expert witness, stating:

> "Now, how they deviated from the standard of care in this situation I will never know. I just don't understand it. Dr. Todd is certain that they deviated from the standard of care, but he has no idea what it is, what the standard of care would be[,] because he's never practiced in a maximum security prison."

The standard of care against which a doctor's negligence is judged is the central issue in any action for medical malpractice. These statements and others made during closing arguments eliminate any possibility that the erroneous jury instructions were harmless. Reversible error took place because the instructions indicated a different standard of care was required of Dr. Gibbens and Dr. Dalal.

The trial court also refused plaintiff's instruction No. 11, which stated that a doctor practicing within the prison owes a resident whom he treats the same duty of care which the doctor owes his patients in private practice. The instruction is not an IPI instruction and was based upon *Madden v. Kuehn* (1978), 56 Ill. App. 3d 997, 372 N.E.2d 1131, a decision of the Second District Appellate Court involving tort immunity of prison doctors. The decision notes that tort immunity of public officials depends upon whether the State employee's conduct was either discretionary or ministerial in nature. A discre-

tionary act is then defined as one which is essentially governmental in character. The court held that the defendant prison physician's actions were not governmental in nature and concluded that there is "nothing unduly burdensome in holding that physicians employed by the Department of Corrections owe inmates whom they treat the same duty of care which they owe their patients in private practice." *Madden*, 56 Ill. App. 3d at 1002, 372 N.E.2d at 1135.

We find that IPI Civil 3d No. 105.01 sufficiently instructs the jury regarding the applicable standard of care. Non-IPI instructions should not be used if the IPI instructions correctly and adequately state the law. (*Marin v. American Meat Packing Co.* (1990), 204 Ill. App. 3d 302, 310, 562 N.E.2d 286, 287.) The trial court has discretion to determine what instructions to give the jury. (*Hany v. General Electric Co.* (1991), 221 Ill. App. 3d 390, 398, 581 N.E.2d 1213, 1218.) There was no abuse of that discretion in denying plaintiff's instruction No. 11.

Next, plaintiff contends the trial court erred when it refused plaintiff's instruction No. 14, which stated that one who undertakes to render services to another, which he should recognize as necessary for the protection of the other's person, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if his failure to exercise such care increases the risk of harm or lessens the effectiveness of treatment. This instruction is based upon section 323 of the Restatement of Torts (Restatement (Second) of Torts §323 (1965)), which was adopted in *Chambers v. Rush-Presbyterian-St. Luke's Medical Center* (1987), 155 Ill. App. 3d 458, 464, 508 N.E.2d 426, 430, which in turn was rejected by a different panel of the First District Appellate Court in *Hare v. Foster G. McGaw Hospital* (1989), 192 Ill. App. 3d 1031, 1038, 549 N.E.2d 778, 783-84. Our court refused to adopt section 323(a) in *Curry v. Summer* (1985), 136 Ill. App. 3d 468, 477, 483 N.E.2d 711, 717-18. In accord with our decision in *Curry*, we find no error in the trial court's refusal to give plaintiff's instruction No. 14.

Finally, plaintiff contends the trial court erred when it refused plaintiff's instruction No. 12, which stated that custom and usage cannot alter or change the standard of conduct required by law, and the fact that a thing is done in the usual way does not furnish an excuse for failure to exercise proper care. At the jury instruction conference, plaintiff argued the instruction was designed to address the fact that even though the pattern of referral in a prison may be different than that of the community at large, it does not affect the standard of care. Dr. Dalal contends plaintiff's instruction No. 12 unfairly empha-

sizes a particular aspect of the evidence, is one-sided and argumentative on its face. We agree and find no error in the court's refusal to give the instruction.

## EXPERT WITNESS

■ Next, plaintiff contends the trial court erred in refusing to allow Dr. Lockhart to express an opinion regarding the alleged negligent practices of Dr. Dalal and Dr. Gibbens. The presentation of Lockhart's testimony was surrounded by confusion, largely the result of a lack of preparation on the part of plaintiff's counsel. In the middle of direct examination, plaintiff's counsel admitted during a side bar that he was still not certain whether he would question Lockhart regarding defendant's negligence. This side bar also revealed Dr. Lockhart had only reviewed Dr. Miller's medical records for Moss during the lunch recess and he had never seen records of Dr. Dalal and Dr. Gibbens for Moss. Further complicating matters, the trial court continued to wrestle with questions regarding the standard of care in a prison setting and whether an ophthalmologist should be allowed to testify as to the standard of care required of those outside his specialty.

The trial court's refusal to allow Dr. Lockhart to express an opinion regarding Dr. Dalal and Dr. Gibbens appears to be based upon the fact that Dr. Lockhart had not reviewed the records prior to his testimony. Similarly, the trial court's refusal to allow plaintiff to ask a hypothetical question focused on plaintiff's counsel's failure to prepare the question in advance. In light of our reversal based upon the erroneous jury instruction, we need not address the propriety of these rulings. We do not believe these problems will arise on retrial. We would be remiss, however, if we failed to exonerate the trial judge from fault. The burden of preparation for trial is rightfully placed upon trial counsel.

## ADMISSIBILITY OF EXPERT WITNESS TESTIMONY

■ Both plaintiff's experts, Dr. Todd (ophthalmologist and optometrist practicing in North Carolina) and Dr. Lockhart (ophthalmologist on Gailey staff), were allowed to testify as to standard of care as it applied to the question of Dr. Miller's referral practice with plaintiff. Citing *Dolan v. Galluzzo* (1979), 77 Ill. 2d 279, 396 N.E.2d 13, Dr. Miller contends this was reversible error because ophthalmologists are of a different school of medicine than optometrists.

Initially we recognize that Dr. Todd practiced as both an ophthalmologist and optometrist. Based upon his testimony that a nationwide standard exists for the referral of serious eye injuries, the trial

court's admission of his testimony was not an abuse of discretion. See *Purtill v. Hess* (1986), 111 Ill. 2d 229, 242, 489 N.E.2d 867, 872.

Our supreme court has held that in order to testify as an expert on standard of care in a given school of medicine, the witness must be licensed therein. (*Dolan,* 77 Ill. 2d at 285, 396 N.E.2d at 16.) Second, the expert must show familiarity with the methods, procedures, and treatments ordinarily observed by other physicians, in either the defendant physician's community or a similar community. Once the foundational requirements are met, it lies within the sound discretion of the trial court to determine if the witness is qualified as an expert regarding the standard of care. (*Purtill,* 111 Ill. 2d at 243, 489 N.E.2d at 873.) These requirements are a threshold beneath which the plaintiff cannot fall. If either requirement is not met, the trial court must disallow the expert's testimony. (*Jones v. O'Young* (1992), 154 Ill. 2d 39, 44, 607 N.E.2d 224, 226.) In reaffirming the *Purtill* decision, the supreme court in *Jones* stated:

"Whether the expert is qualified to testify is not dependent on whether he is a member of the same specialty or subspecialty as the defendant but, rather, whether the allegations of negligence concern matters within his knowledge and observation." *Jones,* 154 Ill. 2d at 43, 607 N.E.2d at 226.

At first blush it would appear that the *Dolan* requirement would bar Dr. Lockhart's testimony as to Dr. Miller's standard of care. We are continuously amazed as to the applicability of the axiom "for every rule there is an exception." In this case, we have no doubt that the allegations of negligence concern matters within Dr. Lockhart's knowledge and observation.

Dr. Lockhart works with optometrists associated with Gailey. He is a specialist who receives eye injury and eye disease problems from general practitioners and from optometrists. In the present case, we have evidence of a severe beating to the eye and the distorted left eye, indicating a condition outside the skill of the general practitioners or the optometrist. This case does not involve opinion as to medical care by the general practitioner or the optometrist—it involves a question of whether early referral to one who was specialized in the treatment of such injuries was required. Who better to testify as to standard of referral in such a case—the physicians and optometrists who are not capable of providing necessary treatment or the specialist who knows a referral should be made? Perhaps our ruling is an exception to the *Dolan* requirement, although perhaps it is also true that this is a case where negligence is so grossly apparent that it avoids

the strictness of *Dolan.* The trial court did not err in allowing Dr. Lockhart's testimony.

## COMPARATIVE NEGLIGENCE

■■■ On March 8, 1984, plaintiff was discharged from the prison hospital and returned to the cell block. Dr. Gibbens claimed he told plaintiff to return to sick call in one week. However, no records exist of any physician's order to have him returned. A note on plaintiff's medical records stated that plaintiff should be seen again in one week, but plaintiff contended he was never advised of this. A nurse from the prison hospital testified that plaintiff was a no-show for sick call on March 14, 1993, but no records indicate who made this appointment. Defendant argued at trial that plaintiff shared in the negligence when he allegedly missed the March 14, 1984, appointment. The jury agreed and reduced the award by one third.

The burden of proving plaintiff's comparative negligence was upon defendants. (*Casey v. Baseden* (1986), 111 Ill. 2d 341, 346, 490 N.E.2d 4, 6.) However, not every negligence of plaintiff will be considered under the doctrine of comparative negligence.

" 'The plaintiff's negligence will not bar recovery unless it is a "proximate cause" of his injury. This means, of course, that it must be at least a cause in fact ***.' (4 F. Harper, F. James & O. Gray, Torts sec. 22.10, at 342 (2d ed. 1986).) 'Plaintiff will not, of course, be barred by contributory negligence *unless* his negligence was a proximate cause of the damage sued for.' (Emphasis in original.) 4 F. Harper, F. James & O. Gray, Torts sec. 22.2, at 273 (2d ed. 1986)." *Owens v. Stokoe* (1986), 115 Ill. 2d 177, 183, 503 N.E.2d 251, 254.)

Citing the Restatement (Second) of Torts, the supreme court held that a plaintiff's negligence is a legally contributing cause of his harm only if it is a substantial factor in bringing about his harm. In order to reduce the award of damages, plaintiff's negligence must have been a proximate cause of his injuries. (*Owens,* 115 Ill. 2d at 183, 503 N.E.2d at 254.) The standard for determining whether contributory negligence may be decided as a matter of law is governed by *Pedrick.* (*Owens,* 115 Ill. 2d at 184, 503 N.E.2d at 254.) We find the evidence presented too speculative to sustain the comparative negligence verdict against plaintiff.

## SUFFICIENCY OF DAMAGES

■■■ Plaintiff argues that the award of damages, even in absence of a comparative negligence finding, was palpably inadequate. The

jury awarded plaintiff $0 for past and future earnings and only $75,000 for permanent disability, gross disfigurement, and daily suffering. Plaintiff argues the award is completely unsupported by the evidence and wholly inadequate as a matter of law. Evidence established that plaintiff suffered a severe injury which could cause him problems the rest of his life. There was testimony of double vision, disfigurement, and dizziness, all of which interfered with everyday activities. Reading is difficult, and job opportunities are limited due to an alleged inability of employers to insure plaintiff. Pointing to the alleged unfair and prejudicial remarks, plaintiff contends the jury's verdict was the result of passion and prejudice.

Plaintiff was, of course, an inmate at the time of the injury and later paroled. However, by time of trial he was again an inmate because of a parole violation involving his being armed with a weapon. Dr. Miller cites plaintiff's own testimony that he was unemployed prior to his incarceration for armed robbery, that his work history involved numerous jobs held for short periods of time, and the fact that he would omit information about his incarceration from employment applications. Dr. Miller contends a jury could reasonably infer that plaintiff's work history and periods of incarceration had a substantial effect on his employability. In addition, the jury heard testimony that plaintiff held a valid Illinois driver's license and could read, albeit with some difficulty. The mere fact that a verdict is less than claimed damages does not necessarily mean the award is inadequate, even where defendant offered no contradictory evidence. A jury is free to determine credibility of witnesses and to assess the weight to be accorded their testimony. (*Montgomery v. City of Chicago* (1985), 134 Ill. App. 3d 499, 502, 481 N.E.2d 50, 53.) We find, considering the evidence, that the $75,000 was not an abuse of the fact finder's discretion.

### REMAND

■■ The "pure" form of comparative negligence adopted by the Illinois Supreme Court in *Alvis v. Ribar* (1981), 85 Ill. 2d 1, 421 N.E.2d 886, was replaced with a modified comparative negligence by the legislative adoption of sections 2—1107.1 and 2—1116 of the Code of Civil Procedure, both becoming effective November 25, 1986. (Ill. Rev. Stat. 1991, ch. 110, pars. 2—1107.1, 2—1116.) Instructions Nos. B45.03 and B45.03.A (IPI Civil 3d Nos. B45.03, B45.03.A) comply with the comparative negligence requirements. In trial of this case, evidence established there could be only one injury by defendants and that one injury could only be the delay in referral. Because of limited

evidence relating to the required time for referral to an ophthalmologist, coupled with the reliance of both Dr. Gibbens and Dr. Dalal on Dr. Miller's knowledge of the condition of Moss' eye prior to the beating, it becomes apparent that the facts in evidence require a finding of only one injury. Perhaps that injury was caused in part by Dr. Gibbens and Dr. Dalal, as well as Dr. Miller.

Realizing there was only one injury, we necessarily conclude the instructions required the jury, if finding liability, to assess damages based upon that injury—nothing more, nothing less.

Because all defendants stayed in the case until verdict, all parties were given an opportunity to present proof of the extent of damages and argument relating thereto. Because only one injury was involved, we conclude determination of damages by the jury would necessarily be the same, no matter which defendants were found liable. We then conclude on remand there is no need to relitigate the issue of damages. The only issue to be decided is whether Dr. Gibbens and Dr. Dalal are liable and, if so, the percentage of liability apportioned to each, comparative to the liability of Dr. Miller.

Affirmed in part, reversed in part, and remanded with directions.

KNECHT and GREEN, JJ., concur.