EASTERBROOK, Circuit Judge,
joined by FLAUM and KANNE, Circuit Judges,
dissenting.
My colleagues take it as established that the Constitution entitled Petties to an orthopedic boot, or some other means to immobilize his foot, immediately after his injury. They remand for a trial at which a jury must determine whether the defendants were deliberately indifferent to the pain his ruptured Achilles tendon caused. This approach effectively bypasses one of the two issues that matter to any claim under the Cruel and Unusual Punishments Clause: first there must be a cruel and unusual punishment, and only then does it matter whether the defendant acted with the mental state necessary for liability in damages. See, e.g., Helling v. McKinney, 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). A court should begin with the conduct issue and turn to mental states only if the behavior was objectively cruel and unusual. And Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court’s sole decision addressing the question whether palliative medical treatment (pain relief without an effort at cure) violates the Eighth Amendment, holds that palliation suffices even if the care is woefully deficient.
To understand the Supreme Court’s conclusion that medical malpractice is a problem under state law rather than the Constitution, it helps to start with the facts of Estelle, which may be found in the Fifth Circuit’s opinion, Gamble v. Estelle, 516 F.2d 937 (5th Cir. 1975), as well as the Supreme Court’s. Gamble alleged that a 600-pound bale had fallen on him and injured his back, leaving him in pain so severe that he frequently fainted (his complaint called the episodes “blank-outs”). He visited the prison infirmary and received medicine designed to dull the pain. When he said that this did not work, and that the pain and blackouts were continuing, the prison gave him more of the same medicine. When he said that his pain prevented him from working, he was treated as a •shirker and thrown into solitary confinement. Although the prison’s medical staff stuck to ineffective medication, it did nothing to find out what kind of injury Gamble had suffered and how the problem might be fixed.
The Fifth Circuit ruled that Gamble had established a constitutional claim, because “the State has totally failed to provide adequate treatment of [his] condition. Again and again, as the complaint makes clear, the only medication prescribed was to relieve the pain, not to cure the injury; indeed, the exact nature of the back injury remains unknown.” 516 F.2d at 941 (em *735 phasis added). The Fifth Circuit thought that the Constitution requires not only palliation but also a medically competent effort to cure, starting with an x-ray, a diagnostic procedure that the prison had not employed.
The reader of today’s majority opinion would suppose that the Supreme Court affirmed the Fifth Circuit’s demand for competent care. But that’s not what happened. The Supreme Court reversed and held that palliation satisfies the Constitution, even if the prison’s medical staff does not try to determine how pain is being caused and what might be done to cure it. That some care was given was enough. The Justices said that deliberate indifference to a prisoner’s pain violates the Constitution if it leads the staff to do nothing, but that medical care meets the constitutional standard. Gamble received care. He received nrretched care, but the Court held that a claim based on deficient care depends on state medical-malpractice law. 429 U.S. at 107 & n.15, 97 S.Ct. 285. The Justices disapproved the Fifth Circuit’s conclusion that the Constitution entitles prisoners to “adequate” care.
Our initial question therefore ought to be: Did the defendants provide Petties with medical care? That question is easily answered. Petties concedes that he received medical care — quite a lot of it. The majority opinion outlines the basics. In January 2012 Dr. Imhotep Carter correctly diagnosed a ruptured Achilles tendon and gave Petties crutches, ice, and Vicodin (a pain-reducing drug). He referred Pet-ties to a specialist. In March 2012 an MRI exam confirmed Carter’s diagnosis. Dr. Anuj Puppala, an orthopedist, gave Petties an orthopedic boot to reduce motion of the foot (in relation to the tendon) when he walked. Carter authorized the use of the boot in the prison, assigned Petties to a lower bunk, and continued the ice and drug treatments. In July 2012 Carter referred Petties to Dr. Samuel Chmell, an ankle specialist who recommended physical therapy, stretching, and another MRI. After replacing Carter as Stateville’s medical director, Dr. Saleh Obaisi continued the course of treatment that Petties was receiving, including use of the boot. The second MRI, which Obaisi approved, showed partial healing.
Petties maintains that Carter and Obaisi should have done more — that Carter should have provided an orthopedic boot in January 2012 rather than waiting until Petties saw Puppala in March, and should have authorized surgery; that Obaisi should have authorized physical therapy in addition to ordering another MRI and continuing the treatment • already provided (the boot, the lower bunk, and so on). Nonetheless, there can be no question that Petties received more, and better, medical care than Gamble received. Yet Gamble lost on the pleadings.
Estelle holds that a claim of deficient medical care must proceed under state law rather than the Constitution. When the prison provides no care for a serious medical condition, that counts as cruel and unusual punishment if the physicians or other responsible actors are deliberately indifferent to the condition. (Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), supplies the Court’s definition of “deliberate indifference”.) Estelle recognized one more potential category: harmful interventions. 429 U.S. at 104 & n.10, 97 S.Ct. 285. But Petties does not contend that the care he received from Carter and Obaisi made his condition worse, compared with no care at all.
Notes 10 and 12 of Estelle suggest a potential way to distinguish malpractice from a violation of the Constitution: whether the prison’s staff exercised medical judgment. Petties does not pursue this possibility; he does not deny that the de *736 fendants exercised medical judgment. Instead he insists that they exercised bad medical judgment, leading to inferior care. And Estelle holds that a claim of poor care must be classified under the law of medical malpractice. (Petties complains that Carter and Obaisi deemed surgery and rehabilitative therapy too expensive, but asking whether a potential treatment is cost-justified is part of professional judgment. Outside of prisons, solvent patients and their insurers, as well as physicians, routinely consider whether a particular drug or medical procedure is worth the price.)
At least three circuits ask whether the prisoner received some treatment, rather than whether the treatment was inferior (even grossly deficient). See, e.g., Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979); Durmer v. O’Carroll, 991 F.2d 64, 68-69 (3d Cir. 1993); Self v. Crum, 439 F.3d 1227, 1230-33 (10th Cir. 2006) (discussing other eases in the circuit); Farmer v. Moritsugu, 163 F.3d 610, 614-16 (D.C. Cir. 1998). Today’s decision is incompatible with the approach of those circuits, though it has support in decisions of the Ninth Circuit. See, e.g., Snow v. McDaniel, 681 F.3d 978 (9th Cir. 2012); Hamilton v. Endell, 981 F.2d 1062, 1066-67 (9th Cir. 1992). The First Circuit may have an intra-circuit conflict. Compare Perry v. Roy, 782 F.3d 73 (1st Cir. 2015), with Feeney v. Correctional Medical Services, Inc., 464 F.3d 158 (1st Cir. 2006). Still other circuits are hard to classify.
My colleagues say that prisoners are entitled to relief under the Eighth Amendment when prison physicians do not employ “competent medical judgment” (opinion at 729) or “minimally competent medical judgment” (id. at 729-30). That tracks state tort law and is incompatible with Estelle. Other phrases in the opinion, such as “professional judgment” (id. at 730 and 733) and “reasonable medical judgment” (id. at 730) also seem to be proxies for the law of medical malpractice and equally at odds with Estelle.
And if we were authorized to find a “competent medical judgment” standard in the Constitution, why should we want to federalize the law of medical malpractice? Prisoners such as Petties have a tort remedy under state law. Carter and Obaisi were employed by Wexford rather than the state. They owe prisoners the same duties as any physician owes to private patients and are subject to the same remedies under Illinois law. See Jinkins v. Lee, 209 Ill.2d 320, 336, 282 Ill.Dec. 787, 807 N.E.2d 411 (2004). Even physicians employed by the state are subject to the normal rules of tort law. See 745 ILCS 10/6 — 106(d); Moss v. Miller, 254 Ill.App.3d 174, 181-82, 192 Ill.Dec. 889, 625 N.E.2d 1044 (1993). When prison physicians are employed by the state, inmates have an extra remedy by suit against the state itself, see 745 ILCS 5/1; 705 ILCS 505/8(d), just as inmates injured by medical malpractice in federal prisons can use the Federal Tort Claims Act. Perhaps prisoners hope that constitutional claims will produce awards of attorneys’ fees under 42 U.S.C. § 1988(b), while Illinois requires plaintiffs to bear their own fees, but § 1988 is not a good reason to constitution-alize tort law. And federal law comes with complications, such as qualified immunity and the deliberate-indifference standard, missing from state law. Estelle told the courts of appeals to relegate bad-treatment situations to state law, and we should carry out its approach.