**Albert L. ROSS, Plaintiff and Appellee,**

v.

**Greg M. SCHACKEL, M.D., Defendant and Appellant.**

No. 930629.

Supreme Court of Utah.

July 12, 1996.

Ross C. Anderson, Nathan B. Wilcox, Salt Lake City, for plaintiff.

Jan Graham, Att'y Gen., Elizabeth King, Carol Clawson, Asst. Att'ys Gen., Salt Lake City, for defendant.

HOWE, Justice:

Plaintiff Albert L. Ross, a prison inmate, brought this negligence action against defendant Greg M. Schackel, a physician employed by the Utah State Prison. The district court denied Schackel's motion for summary judgment, and we granted his petition for interlocutory review.

In his complaint, Ross alleged that Schackel negligently misdiagnosed his leg fracture as cartilage and ligament damage, failed to treat the fracture, and ignored his repeated complaints of severe pain. As a result, his leg healed improperly and physicians at the University of Utah Medical Center had to perform surgery to rebreak the leg and set it properly with pins and metal rods. He brought this action against Schackel, claiming damages for physical pain, mental anguish, and severe leg impairment. Schackel moved to dismiss, contending that he was immune from liability for negligence under the Governmental Immunity Act, Utah Code Ann. § 63–30–4(4).[1] The trial court denied the motion, ruling that subsection 63–30–4(4) was unconstitutional under the open courts clause of the Utah Constitution. Utah Const. art. I, § 11. After further discovery, Schackel moved for summary judgment, arguing that subsection 63–30–4(4) did not violate the open courts clause because it was not an arbitrary or unreasonable abrogation of the rights or remedies that prisoners enjoyed at common law. The trial court rejected that argument and denied the motion. Schackel appeals.

■ We initially dispose of Ross's contention that this court lacks jurisdiction to grant and hear Schackel's appeal. He argues that the district court entered its order denying Schackel's motion for summary judgment on November 18, 1993, and that Schackel's petition for permission to appeal from that interlocutory order was not filed within twenty days thereafter as mandated by rule 5(a) of the Utah Rules of Appellate Procedure.

We conclude that we do have jurisdiction. Because the order denying Schackel's motion for summary judgment was not a final order, he could and did move for reconsideration of that denial. Utah R.Civ.P. 54(b); *Timm v. Dewsnup*, 851 P.2d 1178, 1185 (Utah 1993). His motion to reconsider was denied by the district court on December 6, 1993. His petition for permission to appeal from that December 6 denial was timely filed on December 27 (December 26, the twentieth day, fell on a holiday). Thereafter, this court granted Schackel's petition for permission to appeal from the December 6 order of denial.

■ In determining whether the trial court correctly denied Schackel's motion for summary judgment, we examine whether there is a genuine issue as to any material fact, and if there is not, we examine whether Schackel is entitled to judgment as a matter of law. *Arrow Indus., Inc. v. Zions First Nat'l Bank*, 767 P.2d 935, 936 (Utah 1988). Under subsection 63–30–4(4) of the Utah Code, a plaintiff cannot maintain an action against a government employee unless the

---

1. Section 63–30–4(4) provides:

An employee may be joined in an action against a governmental entity in a representative capacity if the act or omission complained of is one for which the governmental entity may be liable, but no employee may be held personally liable for acts or omissions occurring during the performance of the employee's duties, within the scope of employment, or under color of authority, unless it is established that the employee acted or failed to act due to fraud or malice.

employee acted with fraud or malice. *Lancaster v. Utah State Prison,* 740 P.2d 261, 262 (Utah 1987); *Maddocks v. Salt Lake City Corp.,* 740 P.2d 1337, 1339 (Utah 1987). In this case, Ross has alleged only negligence. Therefore, we must reverse the trial court's order denying Schackel's motion for summary judgment unless we find that subsection 63–30–4(4) is unconstitutional as applied to prisoners' negligence actions against prison physicians. In examining this issue, we grant no deference to the trial court's conclusions of law but review them for correctness. *Madsen v. Borthick,* 769 P.2d 245, 247 (Utah 1988).

## I. THE OPEN COURTS CLAUSE

The open courts clause provides:

All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, which shall be administered without denial or unnecessary delay; and no person shall be barred from prosecuting or defending before any tribunal in this State, by himself or counsel, any civil cause to which he is a party.

Utah Const. art. I, § 11. Schackel asks this court to reconsider its holding in *Berry v. Beech Aircraft Corp.,* 717 P.2d 670, 680 (Utah 1985), that the open courts clause limits the legislature's ability to substantially modify or abrogate remedies for injuries to person, property, or reputation. He argues that, on its face, the open courts clause protects procedural rather than substantive rights and limits judicial rule making, not legislative lawmaking. He also argues that this court's interpretation of the open courts clause in *Berry* violates the fundamental principle of separation of powers by empowering the common law with constitutional status over statutory law. Finally, he asserts that the political climate during the early history of Utah, which was characterized by distrust of courts, demonstrates that the constitutional framers wrote the open courts clause solely as a limitation on the judiciary, not on the legislature.

■ It is unnecessary for us in this case to undertake the reconsideration of our holding in *Berry* because even under that deci-sion, the denial of Schackel's motion for summary judgment cannot be sustained. Under *Berry,* subsection 63–30–4(4) is unconstitutional if it abrogates an existing legal remedy for the violation of a basic right and fails either to provide an alternative remedy or to justify the abrogation by citing the vindication of a social or an economic evil. *Berry,* 717 P.2d at 677 n. 4, 680. In deciding whether this subsection abrogated such a remedy, we must examine the common law at the time of statehood to determine whether a prisoner could recover damages from a prison physician for negligent medical care. *Id.* at 676 n. 3

■ An examination of the cases decided by this court at or about the time of statehood reveals the general rule that public officers and employees enjoyed no official immunity for negligently performed ministerial acts but were shielded by immunity if the act involved the exercise of discretion. In *Clinton v. Nelson,* 2 Utah 284 (1877), a prisoner sued a U.S. marshal for false imprisonment and for "cruel and inhuman treatment" while a prisoner. *Id.* at 285. On the first issue, the prisoner contended that the marshal improperly imprisoned him at a location other than the county jail. *Id.* at 287. The Utah Territorial Supreme Court held that the marshal, who had acted in good faith and on a valid warrant, was entitled to "reasonable discretion" as to where he should house the prisoner. *Id.* at 290. On the second issue, the court found, "Nothing whatever has appeared that would evince any intention on the part of the marshal to act cruelly toward the appellant." *Id.* The court concluded that the prisoner was not entitled to any damages because the marshal had not violated any duty to the prisoner. *Id.* at 291.

In the early years of statehood, this court decided *Garff v. Smith,* 31 Utah 102, 86 P. 772 (1906). In *Garff,* a sheepherder brought a negligence action against the state sheep inspector, contending that the inspector's quarantine of his sheep in a place without proper food caused the death of 1,500 head. 31 Utah at 105–06, 86 P. at 772–73. The court articulated the following rule:

[A] public officer, acting judicially, or in a quasi judicial capacity, cannot be made personally liable in a civil action, unless the act complained of be willful, corrupt, or malicious, or without the jurisdiction of the officer. But, if the duties of the officer are merely ministerial, he is liable in a civil action when, in the performance of them, he acts negligently.

31 Utah at 107, 86 P. at 773. The court concluded that the inspector's actions were quasi-judicial in nature because he was statutorily authorized to make immediate regulations for the quarantining of diseased sheep. 31 Utah at 108, 86 P. at 774. These regulations, including the defining of the place and limits of the quarantine, were left wholly to the judgment and discretion of the inspector. Thus, the court held that the inspector was immune from a negligence action. *Id.*

This court continued to recognize the ministerial versus judicial/quasi-judicial distinction, although using somewhat different terminology, in *Richardson v. Capwell*, 63 Utah 616, 176 P. 205 (1918). In *Richardson*, this court found that a marshal could not be liable for false imprisonment if he acted pursuant to a warrant, in good faith, and without malice because the arrest, conviction, and imprisonment of a person are "official acts" subject to immunity. 63 Utah at 624, 176 P. at 208. However, we held that a jailer had to provide food, warmth, and sanitary conditions to prisoners and that a prisoner could obtain compensatory damages from a jailer for failing to provide these necessities. *Id.* The "official" acts referred to in *Richardson* were granted immunity the same as judicial/quasi-judicial acts were in *Garff.* The court explained that sound public policy demands that "all judicial officers feel free to exercise their duties fearlessly and without the dread or fear of a damage suit for false imprisonment for any mistake of judgment." 63 Utah at 624, 176 P. at 209.

We echoed this rule and policy statement in *Hjorth v. Whittenburg*, 121 Utah 324, 241 P.2d 907 (1952). There we held that a state road commissioner exercising his discretionary, official duties was not liable for damages to property adjacent to a highway, "otherwise public officials would be fearful to act at the risk of finding themselves personally liable for acts done in good faith in the performance of their duties." 121 Utah at 329, 241 P.2d at 909.

More recently, in *Sheffield v. Turner*, 21 Utah 2d 314, 445 P.2d 367 (1968), an inmate brought an action against the warden of the Utah State Prison for injuries he received when a fellow prisoner stabbed him. We explained, "The anciently established and almost universally recognized general rule which this court has consistently announced and adhered to is that the government, its agencies and officials performing governmental functions are protected by sovereign immunity." 21 Utah 2d at 316, 445 P.2d at 368 (footnote omitted). We contrasted the potential for abuse of prisoners with the need of prison supervisors to have broad power in maintaining order and discipline, stating, "If such officials are too vulnerable to lawsuits for anything untoward which may happen to inmates a number of evils follow, including a breakdown of discipline and the fact that capable persons would be discouraged from taking such public positions." 21 Utah 2d at 317, 445 P.2d at 369 (footnote omitted). We concluded:

> [W]here one inmate has injured another, the warden and other prison officers are protected by the doctrine of sovereign immunity against claims of negligence so long as they are acting in good faith and within the scope of their duties, and that they could not be held liable unless they were guilty of some conduct which transcended the bounds of good faith performance of their duty by a wilful or malicious wrongful act which they know or should know would result in injury.

*Id.*

*Sheffield*, therefore, granted broad immunity to acts of prison officers absent a "wilful or malicious wrongful act," justifying the doctrine on the basis of prison officers' need to maintain order and discipline among the most rancorous individuals in society. Although unstated, this immunity apparently applied only to discretionary acts of prison

officers but not to ministerial duties.[2] *See Cornwall v. Larsen*, 571 P.2d 925, 927 (Utah 1977) (commenting to this effect).

 Drawing on these cases, we can identify the applicable rule at common law: A prison doctor, if performing a ministerial duty in good faith, would have been liable for compensatory damages but not for punitive damages. However, the doctor would have been immune from an action for negligence if acting in a discretionary, official capacity. Applying this rule to the facts in this case, we examine whether Schackel's care of Ross constituted a ministerial act at common law.

In *Garff*, we described a ministerial act as one that is

absolute, certain, and imperative, involving merely the execution of a set task, and when the law which imposes it prescribes and defines the time, mode and occasion of its performance with such certainty that nothing remains for judgment or discretion. Official action is ministerial when it is the result of performing a certain and specific duty arising from fixed and designated facts.

. . . . .

A ministerial act is one which a public officer is required to perform upon a given state of facts in a prescribed manner in obedience to the mandate of legal authority and without regard to his own judgment or opinion concerning the propriety or impropriety of the act to be performed.

*Garff*, 31 Utah at 107–08, 86 P. at 773–74 (adopting the language of *People v. Bartels*, 138 Ill. 322, 27 N.E. 1091, 1092 (1891), and

*State v. Meier*, 143 Mo. 439, 45 S.W. 306, 308 (1898)).

Thirty years later, in *State Tax Commission v. Katsis*, 90 Utah 406, 62 P.2d 120 (1936), this court cited with approval the following definitions of what constitutes a ministerial act:

"The duty is ministerial, when the law, exacting its discharge, prescribes and defines the time, mode and occasion of its performance, with such certainty that nothing remains for judgment or discretion." *Grider v. Tally*, 77 Ala. 422, 54 Am. Rep. 65.

"A ministerial act may be defined to be one which a person performs in a given state of facts in a prescribed manner in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment upon the propriety of the acts being done." 2 Bouv.Law Dict. 416; 27 Cyc. 793.

90 Utah at 413, 62 P.2d at 123 (holding tax assessment a quasi judicial act). An example of a ministerial duty for which there is no immunity occurred in *Connell v. Tooele City*, 572 P.2d 697, 699 (Utah 1977), where a court clerk was held to be liable for failing to properly docket the payment of a fine, resulting in the issuance of a bench warrant and subsequent arrest of the plaintiff.[3]

Although we do not have any direct case law to rely upon,[4] applying the standard in *Garff* and *Katsis* we conclude that Schackel's rendering of medical care to prisoners could not properly be described as ministerial in nature at common law. The care a prison

---

**2.** In his dissenting opinion, Associate Chief Justice Stewart relies on *Benally v. Robinson*, 14 Utah 2d 6, 376 P.2d 388 (1962), and states that we there held that the officer involved "was not immune for his negligent ministerial conduct." However, I can find no mention of immunity in the court's opinion.

**3.** In his dissenting opinion, Justice Stewart maintains that to be immune, a discretionary act must involve high-level policy making. That is true under the 1965 Governmental Immunity Act, Utah Code Ann. §§ 63–30–1 to –34. *See Carroll v. State*, 27 Utah 2d 384, 388–89, 496 P.2d 888, 891 (1972). In *Frank v. State*, 613 P.2d 517, 520 (Utah 1980), we adopted that definition in a suit against a psychologist working in a state

hospital to make the law congruent in suits against the state under the Immunity Act and suits against the employee whose negligence caused the alleged injury. But as indicated above, before the passage of the Immunity Act, there was no requirement that to be immune, a discretionary act had to involve high-level policy making.

**4.** The parties have not cited us to, nor have we found, any cases specifically addressing the liability of government-employed doctors at the turn of the century. *Cf. Wood v. Boone County*, 153 Iowa 92, 133 N.W. 377, 380–81 (1911) (finding that county overseer of poor was immune from liability for failing to ensure that adequate medical attention was given to transient).

physician provides does not merely involve the execution of a set task without the need for judgment or discretion. Nor does the care arise out of a clear state of facts. Rather, a great deal of judgment and opinion are involved in making a diagnosis and prescribing appropriate medical treatment.

A number of cases from other jurisdictions hold that medical care is discretionary in nature, entitling the physician to immunity. *See Estate of Burks v. Ross*, 438 F.2d 230, 235 (6th Cir.1971) (V.A. hospital physician "in her diagnoses and treatment of patients ... was vested with discretion" and therefore was entitled to immunity from suit); *Smith v. Arnold*, 564 So.2d 873, 876 (Ala.1990) (state hospital psychiatrist immune from liability because his decisions and recommendations concerning patient's care were discretionary); *Canon v. Thumudo*, 430 Mich. 326, 422 N.W.2d 688, 699 (1988) (medical decision making is inherently discretionary); *Baker v. Straumfjord*, 10 Or.App. 414, 500 P.2d 496, 497 (1972) (physician employed at state university infirmary immune from liability for student's suicide because alleged negligent acts were discretionary in nature), *modified by Comley v. Emanuel Lutheran Charity Bd.*, 35 Or.App. 465, 582 P.2d 443, 448 (1978).[5]

Prison doctors would seem to be especially entitled to immunity given that their official duties are integral to the performance of a uniquely governmental function. A recent opinion highlighted the governmental role prison medical workers perform in holding a physician's assistant immune from liability for alleged negligence in diagnosing and treating a jail inmate's fatal pulmonary emboli. *Schmidt v. Adams*, 211 Ga.App. 156, 438 S.E.2d 659, 661 (1993). The court explained that the assistant was not acting "within the scope of a traditional doctor-patient relationship which incidentally arises at a publicly owned or funded hospital," but as a jail employee, "his primary concern and duty is the governmental function of caring for persons confined in the jail." *Id.*, 438 S.E.2d at 660. The court concluded that the assistant's actions "clearly were undertaken in his official capacity and as part of a governmental function." *Id.* at 661. Schackel's duties were likewise uniquely different from those of a doctor in the private sector, where no function distinctive to government is being exercised.[6]

Virginia courts have also distinguished between government physicians generally, *James v. Jane*, 221 Va. 43, 282 S.E.2d 864, 867, 870 (1980) (no immunity for attending physicians on medical school faculty where they essentially acted as independent contractors), and those physicians more closely tied to the government's interests. *Gargiulo v. Ohar*, 239 Va. 209, 387 S.E.2d 787, 790–91 (1990) (holding physician immune where, among other things, he was salaried state employee, received no compensation from patients, and was not permitted to choose or refuse patients); *Lawhorne v. Harlan*, 214 Va. 405, 200 S.E.2d 569, 572 (1973) (same), *overruled on other grounds, First Virginia Bank–Colonial v. Baker*, 225 Va. 72, 301 S.E.2d 8, 12 (1983).

We conclude that under our common law at the time of statehood, physicians employed by the state to provide medical care to prisoners would not have been liable for negligence. We recognize that two recent cases hold prison doctors liable for negligence. *Moss v. Miller*, 254 Ill.App.3d 174, 192 Ill. Dec. 889, 894, 625 N.E.2d 1044, 1049 (1993); *Cooper v. Bowers*, 706 S.W.2d 542, 543 (Mo. Ct.App.1986).[7] Nevertheless, we are per-

---

**5.** We recognize that there is a split of authority on this issue. We do not attempt to address whether immunity should apply to all government-employed physicians generally but limit our decision to those working in prisons.

**6.** In his dissenting opinion, Justice Stewart opines that the medical care of prisoners is not a governmental function, relying on a concurring opinion in *Spencer v. General Hospital of the District of Columbia*, 425 F.2d 479, 489 (D.C.Cir. 1969). There is a vast difference between the operation of a state-owned hospital, where patients are voluntarily admitted as they are at private hospitals, and the operation of a prison, where its residents are kept involuntarily and the state must provide for their every need.

**7.** The dissent cites numerous cases holding physicians employed by state facilities other than prisons liable for negligence. While these cases offer some insights, the issue before us is whether *prison* physicians would be liable *under our common law at the time of statehood*.

suaded that our common law more closely comports with the approach of the court in *Schmidt*. This conclusion is consistent with the public policy of granting immunity in that prison doctors should be able to freely perform their duties without the fear of being sued by prisoners and without spending a significant amount of their time defending lawsuits.[8] *See Richardson*, 63 Utah at 624, 176 P. at 209; *Hjorth*, 121 Utah at 329, 241 P.2d at 909; *Sheffield*, 21 Utah 2d at 317, 445 P.2d at 369.

In his dissenting opinion, Justice Stewart relies upon two cases that we decided over eighty years after statehood and after the passage of the Governmental Immunity Act (the Act) in 1965 which waived governmental immunity in many areas where it had existed since before statehood. In the first case, *Frank v. State*, 613 P.2d 517 (Utah 1980), a patient at the University of Utah Medical Center committed suicide. His family brought suit against the state and a psychologist—not a physician—who worked with the hospital under a contractual arrangement. We held that the Act generally waives the state's immunity when the plaintiff alleges a negligent act of a state employee. *Id.* at 519; *see* Utah Code Ann. § 63–30–10. We further held that the same legal standard should apply to the individual: "[I]t is contrary to reason to deny governmental immunity to a public employer and then grant it to the very employee allegedly causing the injury." *Frank*, 613 P.2d at 520. This denial of immunity to the employee marked a change from the case law we have discussed above and was driven by the necessity to make the law congruent after the change wrought by passage of the Act.

The second case relied upon by Justice Stewart is *Payne v. Myers*, 743 P.2d 186 (Utah 1987), a suit against two state-employed physicians. We noted that a 1978 amendment was made to the Act providing that no government employee shall be held personally liable for his or her acts or omissions unless the employee acted or failed to act due to gross negligence, fraud, or malice.

*Id.* at 188; *see* Utah Code Ann. § 63–30–4(4). We further noted, "Prior to the 1978 amendment, the doctors as governmental employees had no immunity from suit for their simple negligence." 743 P.2d at 188. That statement reflected our decision in *Frank v. State*. It did not reflect the state of the law at or around statehood, when a government employee enjoyed immunity in the performance of discretionary acts.

Because Schackel would not have been liable for negligence under the common law at statehood, it follows that subsection 63–30–4(4) does not violate the open courts clause.

## II. DUE PROCESS

■ Ross contends that even if subsection 63–30–4(4) is valid under the open courts clause, Schackel is not entitled to summary judgment because the subsection violates the due process clause of the Utah Constitution. This clause states, "No person shall be deprived of life, liberty or property, without due process of law." Utah Const. art. I, § 7. In examining the subsection under the due process clause, we will apply the rational basis test. Under this test, we cannot invalidate the subsection unless the recognition of statutory immunity for negligent prison physicians constitutes an unreasonable, arbitrary method of achieving the statutory objectives.

The legislative history fails to explain the objectives of subsection 63–30–4(4), so we will evaluate it on the basis of its perceived purpose with regard to prison employees. *See Blue Cross & Blue Shield v. State*, 779 P.2d 634, 637 (Utah 1989) (explaining that this court may judge statutes on the basis of their reasonable or actual legislative purposes). We perceive that the legislative objective was to balance prisoners' interests in the fulfillment of their basic needs with the public interest in maintaining prison discipline. This court has already recognized that because of the hostile working environment of the prison, workers need some flexibility to maintain security while administering to the daily needs of prisoners. *Wickham v. Fisher*, 629 P.2d 896, 901 (Utah 1981); *Sheffield*,

---

**8.** One prison doctor testified that in fifteen years of private practice, he had been sued by a patient only once. However, in two years at the prison, he was sued twenty-two times and stated that he does not "go a week without being threatened with litigation."

21 Utah 2d at 317, 445 P.2d at 369. Prisoners frequently threaten and assault medical personnel, and they often feign illness to obtain unnecessary medications, manipulate housing assignments, and escape work. If prisoners were allowed to bring actions against medical personnel for negligence, personnel might be more easily manipulated or threatened and breakdowns of discipline might occur. *See id.* Thus, we find that maintaining immunity for prison physicians from actions for negligence but subjecting them to liability for fraud or malice is a reasonable method of meeting prisoners' needs while maintaining discipline in the prison.

### III. UNIFORM OPERATION OF LAWS

■ Finally, Ross contends that subsection 63–30–4(4) violates the uniform operation of laws clause of the Utah Constitution. This clause provides, "All laws of a general nature shall have uniform operation." Utah Const. art. I, § 24. A law is valid under this clause if (1) it applies equally to all persons within a class and (2) the statutory classifications are based on differences that have a reasonable tendency to further the statutory objectives. *Malan v. Lewis*, 693 P.2d 661, 670 (Utah 1984). The standard of reasonableness required by the second part of the test is higher than the standard of reasonableness required under the federal equal protection clause. *Mountain Fuel Supply Co. v. Salt Lake City Corp.*, 752 P.2d 884, 889 (Utah 1988).

■ Ross argues that this court should not apply the reasonableness standard but should apply a "heightened standard of review" as did the lead opinion in *Condemarin v. University Hospital*, 775 P.2d 348, 356 (Utah 1989), because this case involves a classification that infringes upon the right to a remedy and therefore must be supported by a strong countervailing public interest. In making this argument, Ross misstates the law. This court does not apply a heightened standard every time the legislature infringes upon a potential remedy; it applies a heightened standard only when the legislature infringes upon an interest protected by the open courts clause. Such an interest

was involved in *Condemarin*, where Justice Durham articulated and applied a heightened standard and concluded that the Utah Governmental Immunity Act abrogated an individual's common law right to recover damages for injuries negligently inflicted by employees of the University Hospital. *Id.* This conclusion was based upon the common law rule that an individual could recover from a governmental agency if the agency was involved in proprietary activities but not if it was involved in purely governmental activities. *Id.* at 350–52. In this case, however, subsection 63–30–4(4) did not abrogate a common law right to a remedy, and the reasonableness standard applies.

■ Ross asserts that subsection 63–30–4(4) creates two unreasonable classifications. First, it allows all victims of medical malpractice except those injured by government employees to recover from the tortfeasors. However, this is an inaccurate characterization of the classification at issue. The subsection does not separate those injured by government employees from all other medical patients; it separates prisoners injured by prison medical workers' negligent medical care from medical patients injured at the University Hospital and private hospitals. *See Condemarin*, 775 P.2d at 356. We find that this is a reasonable classification.

■ The general principle underlying the uniform operation of laws clause is that "persons similarly situated should be treated similarly, and persons in different circumstances should not be treated as if their circumstances were the same." *Malan*, 693 P.2d at 669. The circumstances of prisoners are drastically different from the circumstances of patients at the University Hospital and private hospitals. In these hospitals, patients check in voluntarily because of health problems. Prisoners, on the other hand, are placed in prison because they have not conformed to the basic rules necessary for living in society, and prison health workers must make judgment calls about prisoners' health while avoiding manipulation and ignoring harassment. The dangers inherent in operating a prison justify, or even necessitate, a classification which separates pris-

oners from other medical patients. While prisoners' status as felons does not justify divesting them of all of their rights, it must play a role in determining whether the statutory classification of prisoners apart from other members of society is constitutional. *See, e.g., Wickham,* 629 P.2d at 901 (acknowledging that prisoners do not enjoy full rights of personal liberty enjoyed by society at large); *In re Goalen,* 30 Utah 2d 27, 30–31, 512 P.2d 1028, 1029–30 (1973) (holding that it is not unconstitutional to deny prisoner the right to marry), *cert. denied,* 414 U.S. 1148, 94 S.Ct. 905, 39 L.Ed.2d 104 (1974). In this case, we find that treating prisoners differently from patients at the University Hospital and private hospitals does not violate the uniform operation of laws clause.

■ The second classification that Ross cites as unreasonable is based upon the premise that subsection 63–30–4(4), when combined with subsection 63–30–10(10), which retains government entities' immunity from liability for injuries arising out of incarceration, effectively precludes prisoners from bringing negligence actions against any party. Ross argues that this unconstitutionally separates prisoners from University Hospital patients, who may recover from the hospital. However, as we have already discussed above, this is not an unreasonable classification, and the fact that prisoners are prohibited from recovering from the state, as well as from the prison physician, does not alter that conclusion. Accordingly, Schackel is entitled to summary judgment as a matter of law.

Reversed.

ZIMMERMAN, C.J., and RUSSON, J., concur.

STEWART, Associate Chief Justice, dissenting:

I respectfully dissent.

The issue in this case is not whether the State must provide expensive medical facilities and equipment at the Utah State Prison, or even the number of trained medical personnel the State should employ to provide adequate medical care to prisoners. The issue is whether Utah Code Ann. § 63–30–4(3) and (4) are unconstitutionally overbroad in permitting lawsuits against government employees for tortious conduct only if their acts are fraudulent and malicious.[1] On the specific facts of this case, the question is whether a physician who treated an incarcerated person had a legal duty not to commit malpractice on that person. The majority holds that the physician has no legal duty to refrain from malpractice. In short, incarcerated persons are not entitled to competent medical treatment and have no legal remedy for negligent treatment that may endanger one's health or life, unless the malpractice is either so extreme as to constitute "cruel and unusual punishment" or is fraudulent or malicious. *See Bott v. DeLand,* 922 P.2d 732 (Utah 1996), also issued today. In effect, prisoners are treated as a subspecies of the human race who are not entitled to reasonable, competent medical care. I find no justification either as a practical or as a legal matter for allowing prison physicians to commit malpractice with impunity. The majority's ruling is repugnant to fundamental legal precepts and contrary to the dictates of stare decisis.

Article I, section 11 of the Utah Constitution declares that every person has a right to

1. Sections 63–30–4(3) and (4) state:
 (3)(a) Except as provided in Subsection (b), an action under this chapter against a governmental entity or its employee for an injury caused by an act or omission that occurs during the performance of the employee's duties, within the scope of employment, or under color of authority is a plaintiff's exclusive remedy.
 (b) A plaintiff may not bring or pursue any other civil action or proceeding based upon the same subject matter against the employee or the estate of the employee whose act or omission gave rise to the claim, unless:
 (i) the employee acted or failed to act through fraud or malice; or

(ii) the injury or damage resulted from the conditions set forth in Subsection 63–30–36(3)(c).
 (4) An employee may be joined in an action against a governmental entity in a representative capacity if the act or omission complained of is one for which the governmental entity may be liable, but no employee may be held personally liable for acts or omissions occurring during the performance of the employee's duties, within the scope of employment, or under color of authority, unless it is established that the employee acted or failed to act due to fraud or malice.

a "remedy by due course of law" for an injury to "person, property or reputation." By virtue of Utah Code Ann. § 63–30–4(3) and (4), the Legislature has abolished an individual's right to a "remedy by due course of law" for an injury inflicted on his person, property, or reputation by a government employee unless the employee acts with fraud or malice. In *Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 675–76 (Utah 1985), a unanimous Court stated that one of the framers' basic purposes in including article I, section 11 in the Declaration of Rights of the Constitution was to prevent politically powerful groups from stripping individuals of legal remedies for injuries to basic personal interests because they have no favor in the legislative halls and are subject to oppression by powerful economic forces, hostility by the majority, or prejudice. Such persons are "generally isolated in society, belong to no identifiable group, and rarely are able to rally the political process to their aid" and therefore were guaranteed a remedy "by due course of law" for injuries to their "persons, property, or reputations." [2] *Berry*, 717 P.2d at 676.[3] In *DeBry*, however, the Court held that the scope of the protections afforded by article I, section 11 had to be viewed in light of the immunities which the courts recognized when the Utah Constitution was adopted: "At the time the Constitution and article I, section 11 were adopted, most remedies for the protection of the interests and values embodied in the terms 'person,' 'property,' and 'reputation' were either common law or equitable remedies, but the law also recognized various tort immunities that were exceptions to those remedies." *DeBry*, 889 P.2d at 435. Thus, by implication, the framers intended such immunities to be exceptions to the rights guaranteed by article I, section 11 unless those immunities became obsolete and were abolished by the Legislature or the Court. *Id.* at 436.[4] The question in the instant case, therefore, is what was the scope of immunity that government employees and officials had as of the time of statehood for their tortious actions?

The official immunity doctrine is a relatively recent development in the common law. As one scholar has stated:

[T]he common law traditionally did not distinguish between public officials and pri-

---

2. Notwithstanding the flatly erroneous assertions to the contrary by the Attorney General, who represents the defendant, this Court has made it abundantly clear that the guaranteed remedy provision of the open courts clause does not constitutionalize the common law. *DeBry v. Noble*, 889 P.2d 428, 436 (Utah 1995); *Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 676 (1985). Indeed, the meaning of the terms "person," "property," and "reputation" have evolved over time. *DeBry*, 889 P.2d at 436. The Attorney General also erroneously asserts that article I, section 11 is procedural only, provides no substantive guarantees for the protections of "person," "property," and "reputation" and, indeed, violates the separation of powers. The arguments border on the absurd. First, a vast number of constitutional provisions limit the Legislature's power to make laws. Such is an important purpose of the Constitution. Such provisions obviously limit legislative power and do not violate the doctrine of separation of power. Second, in *Berry v. Beech Aircraft Corp.*, 717 P.2d 670 (Utah 1985), we carefully analyzed the history of open court clauses and the language of the Utah provision and similar provisions in various other state constitutions, and were compelled to the conclusion that the Utah provision, like those of a number of other states, does indeed provide substantive constitutional protections to the vital interests embodied in one's "person," "property," and "reputation." *Id.* at 674–76.

3. *Berry* recognized, however, that the Legislature could modify or abolish remedies at law for the protection of one's "person, property, or reputation" if a two-part test was met. First, the guarantee in article I, section 11 is met if the Legislature provides an effective and reasonable alternative remedy by due course of law to vindicate the person's constitutionally protected interest. Second, if the Legislature provides no substitute or alternative remedy that is substantially equal in value to the remedy that was abolished, then there must be a "clear social or economic evil to be eliminated" that is demonstrated and "the elimination of an existing legal remedy ... [must not be] an arbitrary or unreasonable means for achieving the objective." *Berry*, 717 at 680. In the instant case, there is no alternative remedy whatsoever, and there is no clear or demonstrable "social or economic evil to be eliminated" that justifies the denial of a legal remedy to a prisoner for malpractice.

4. Of course, new immunities could be created by compliance with the conditions laid down in *Berry*, 717 P.2d at 680. The majority opinion makes no effort to show that those conditions have been met in denying plaintiff a remedy for an injury to his person.

vate individuals for purposes of determining the scope of personal tort liability. In fact, courts that drew such a distinction often imposed a stricter standard of care on officials than on private individuals, holding them personally liable for the consequences of simple non-negligent mistakes.

George A. Bermann, *Integrating Governmental and Officer Tort Liability*, 77 Colum.L.Rev. 1175, 1178 (1977). Indeed, early Utah cases allow an extremely narrow immunity for governmental officers which applied only when acting pursuant to judicial or legislative mandate.

Over time, however, the courts recognized that imposing tort liability on government officials for the exercise of discretionary policy making functions would "make public officials unduly fearful in their exercise of authority and discourage them from taking prompt and decisive action." Bermann, *supra*, at 1178. Accordingly, courts and legislatures provided immunity for officials who exercise judicial, quasi-judicial, or legislative functions. *See Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951); *Bradley v. Fisher*, 13 Wall.(80 U.S.) 335, 20 L.Ed. 646 (1871).

The courts and legislatures also created a qualified immunity for administrative officials and employees who perform discretionary functions. *See, e.g.*, Note, *The Discretionary Function Exception to Governmental Tort Liability*, 61 Marq.L.Rev. 163 (1977); Bermann, *supra*, at 1178–79. The doctrine of official immunity, as contrasted with sovereign immunity, provides those persons who must exercise discretion in making policy decisions and implementing innovative programs with judgmental latitude. The considerations that support immunity for judicial and legislative acts and for discretionary acts of administrative officials do not, however, apply to governmental officials engaged in ministerial acts. The scope of the official immunity doctrine is stated in the Restatement (Second) of Torts § 895D (1975), which provides in pertinent part as follows:

(3) A public officer acting within the general scope of his authority is not sub-

ject to tort liability for an administrative act or omission if

(a) he is immune because engaged in the exercise of a discretionary function.

*Clinton v. Nelson*, 2 Utah 284 (1877), was the first pre-statehood case to deal with the tort liability of a government officer. A prisoner charged a marshal with false imprisonment and tortious mistreatment. The Court held that "*the doctrine is well established, we think, that a ministerial officer, in performing his duties if he acts in good faith* [i.e., without malice] *is only liable for compensatory damages for injuries against law,* and is not liable for exemplary damages." *Id.* at 290 (emphasis added). Furthermore, the Court held, "In a case where the officer is liable for compensatory damages, that is *where no aggravation, no malice is shown— the law fixes the measure of damages at the actual pecuniary loss by reason of the tort.*" *Id.* at 290–91 (emphasis added). By distinguishing between the tortious mistreatment and false imprisonment claims, *Clinton* makes clear that while the marshal could be held liable for his torts committed in performing ministerial acts, he could not be held liable for those committed while functioning in a judicial or quasi-judicial capacity. *See also Snell v. Crowe*, 3 Utah 26, 5 P. 522 (1881) (allowing suit against constable for wrongfully excluding property owner from his property).

The majority relies heavily on language in *Garff v. Smith*, 31 Utah 102, 86 P. 772 (1906), for an extraordinarily narrow definition of the term "ministerial acts." *Garff* stated that "a public officer, acting judicially, or in a quasi-judicial capacity, cannot be made personally liable in a civil action, unless the act complained of be willful, corrupt, or malicious, or without the jurisdiction of the officer." *Id.* at 107, 86 P. 772. In *Garff,* a sheep inspector, as a public officer, was statutorily authorized to enact regulations and take specific actions to protect the public health. *Garff,* 31 Utah at 108, 86 P. 772 (citing 1903 Utah Laws ch. 42, § 4). He was required to exercise what the Court called

*judicial* or *quasi-judicial* discretion in effectuating his statutory duties.[5]

Contrary to the majority's reading of *Garff* and in accord with the Court's ruling in *Clinton, Richardson v. Capwell*, 63 Utah 616, 176 P. 205 (1918), held that the issue of whether a jailer was liable for negligence for failing to provide a prisoner with food, warmth, and proper sanitary conditions was an issue for a jury. Many other courts have held jailers, sheriffs, and other such officials liable for a tortious failure to provide prisoners with such necessities. See cases collected in M.L. Schellenger, Annotation, *Civil Liability of Sheriff or Other Officer Charged with Keeping Jail or Prison for Death or Injury of Prisoner*, 14 A.L.R.2d 353 (1950). Provision of these necessities certainly requires some amount of discretion. Yet the discretion is entirely unrelated to any government policy making function.

Clearly the essence of the ruling in *Richardson* is that a prisoner's right to the necessities of life could not be tortiously withheld with impunity. Reasonable medical care is one such necessity of life. The majority's position in the instant case is that prisoners are not entitled to reasonable medical care because of the wholly unsupported assertion that prison discipline will somehow be harmed if a doctor is held liable for malpractice while actually treating a patient. The majority does not explain how requiring a doctor to meet accepted standards of medical care in diagnosing and treating a patient can adversely affect prison discipline. No other court that I know of has taken such an extreme position.

*Benally v. Robinson*, 14 Utah 2d 6, 376 P.2d 388 (1962), is in accord with *Clinton* and *Richardson* and provides even stronger support for the position that officers owe a duty of reasonable care to prisoners. In *Benally*, this Court held an officer negligent for failing to protect an intoxicated arrestee from harm caused by his intoxication. The Court stated that the *law required the officer to exercise "the degree of care and caution which an ordinary reasonable and prudent person would use under the circumstances"* and *that an officer was not immune for his negligent ministerial conduct.* 14 Utah 2d at 9, 376 P.2d 388 (emphasis added). The case is in accord with a number of official immunity cases from other jurisdictions. *See generally* M.L. Schellenger, Annotation, *Civil Liability of Sheriff or Other Officer Charged with Keeping Jail or Prison for Death or Injury of Prisoner*, 14 A.L.R.2d 353 (1950).

*Sheffield v. Turner*, 21 Utah 2d 314, 445 P.2d 367 (1968), does not support the position that all prison officers and employees have total immunity from civil tort actions. That position is contrary to a vast number of cases from other states and this state. *Sheffield* rests on the traditional distinction between discretionary and ministerial functions and correctly held that *administrative level officials*, such as a prison warden, were immune from a suit alleging *inadequate supervision* of inmates when one inmate stabbed another and there was no foreknowledge of the alleged assault. The decision itself makes clear that its holding pertains only to those in a supervisory capacity. *Id.* at 317, 445 P.2d

---

5. *Garff* must be read in its late nineteenth and early twentieth century context. Cases contemporary with it distinguish between a government employee and a government officer. Professor David notes that "an 'office' essentially involves an exercise of the sovereignty of the State ... within the legal limits set up by the terms of the delegation of the power. These terms are found in the constitution, charters and statutes." Leon T. David, *The Tort Liability of Public Officers*, 12 S.Cal.L.Rev. 127, 132 (1939). The United States Supreme Court offered a similar definition: "An office is a public station or employment, conferred by the appointment of government. The term embraces the ideas of tenure, duration, emolument, and duties." *United States v. Hartwell*, 6 Wall. 385, 393, 18 L.Ed. 830, 832 (1867). Professor David articulated a test for determining whether a particular governmental employee is an officer:

Where the powers conferred and duties imposed rest in statutory or constitutional provisions, and the functions are in the main to be exercised free from the intervention of other individuals in government, in sovereign functions or undertakings, rather than in business enterprise, an office is found to exist under most circumstances.

David, *supra*, at 132 (footnotes omitted) (emphasis added); *see also Vaughn v. English*, 8 Cal. 39, 41 (1857); *State v. Jennings*, 57 Ohio St. 415, 49 N.E. 404 (1898); *Hartigan v. Board of Regents*, 49 W.Va. 14, 38 S.E. 698 (1901); Frank J. Goodnow, *Principles of the Administrative Law of the United States* 223–24 (1905).

367. *Clinton, Richardson,* and *Benally* are consistent with *Sheffield.*

In the instant case, Dr. Schackel was not sued for negligence in performing a supervisory function but for failing to exercise reasonable medical care in the actual diagnosis of a patient's broken leg. The majority argues that Dr. Schackel's position cannot be distinguished from other *supervisory* personnel at the prison who admittedly are immune under *Sheffield.* Equating the nature of a prison warden's duties and responsibilities with the duties and responsibilities of a treating physician makes no sense at all for purposes of the ministerial/discretionary distinction under the law of official immunity. With respect to the official immunity doctrine and the purpose that doctrine was intended to promote, supervisory acts of prison administrative and prison medical personnel and a practicing doctor who actually renders allegedly incompetent medical services to an incarcerated patient are simply not comparable.

Indeed, the majority goes so far as to state that any actions involving deliberation or judgment are discretionary. For that extreme proposition, the majority cites *Garff v. Smith*, 31 Utah 102, 86 P. 772 (1906). As explained above, *Garff* certainly does not provide a precedent for the Court's extraordinary, indeed eccentric, definition of a ministerial act as one involving no discretion of any kind. First, that position is plainly contrary to *Clinton, Richardson, Benally,* and a whole host of other Utah cases, and as far as I know to the rule in every other state in the Union. Second, it is inimical to the policies supporting the doctrine of official immunity. Prosser and Keeton classify discretionary acts that are immune from suit as "involv[ing] some fairly high level of policy making." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 132, at 1060 (5th ed. 1984). The purpose behind official immunity is to avoid the chilling effect that liability can have on a public official who must make critical policy decisions. George A. Bermann, *Integrating Governmental and Officer Tort Liability*, 77 Colum.L.Rev. 1175, 1178 (1977). The majority's definition of ministerial acts far exceeds what is necessary or reasonable to further that policy. A physician treating a patient is not involved in making public policy decisions of any kind.

We explicitly made this point in *Frank v. State*, 613 P.2d 517 (Utah 1980), which concerned a state-employed health care provider's liability for malpractice. The Court held that the health care provider acted in a ministerial capacity and was not entitled to immunity for providing negligent medical care. The action against the State was brought under the waiver of immunity provision in the Governmental Immunity Act; the action against the health care provider was a common law tort action in which the health care provider claimed official immunity as a defense. At that time, the Immunity Act had no provision dealing with official immunity of government employees. The Court stated, "The Utah Governmental Immunity Act has no application to individuals; its function is confined to governmental 'entities.'" *Id.* at 520. In discussing the liability of the State under sovereign immunity, we stated:

> *The Court recognizes the high degree of careful observation, evaluation, and educated judgment reflected in any modern prognosis, and makes no suggestion that a large measure of "discretion," as commonly defined, is not involved.* The exception to the statutory waiver here under consideration, however, was intended to shield those governmental acts and decisions impacting on large numbers of people in a myriad of unforeseeable ways from individual and class legal actions, the continual threat of which would make public administration all but impossible. *The one-to-one dealings of physician and patient in no way reflect* this public policy-making posture, and should not be given shelter under the Act.

*Id.* Here, the Court defined the terms "discretionary" and "ministerial" under the provision in the Governmental Immunity Act that waives *sovereign immunity* for negligent acts of government employees.

Later in the opinion, however, the Court held that the same analysis applied in characterizing the nature of the function performed by a government employee for the purpose of deciding whether the employee was engaged

in a discretionary act and therefore entitled to official immunity or whether he was not so entitled because he engaged in a ministerial act. "There thus appears no reason to apply a different legal standard to the individual than that applied to the government employer, even though the latter is governed by the statute and the former by common law principles. For this reason, *we hold that defendant['s] ... acts in this case were not legally discretionary, but ministerial.*" *Frank v. State*, 613 P.2d 517, 520 (Utah 1980) (emphasis added). Accordingly, the defendant was held liable under the common law because official immunity did not apply. As to the doctrine of official immunity, the Court stated: [6]

> [C]ommon-law principles of sovereign [sic, i.e., "official"] immunity have been developed, however, which offer protection to the individual under certain circumstances. The case of *Cornwall v. Larsen* stands for the proposition that a governmental agent performing a discretionary function is immune from suit for injury arising therefrom, whereas an employee acting in a ministerial capacity, even though his acts may involve some decision-making, is not so protected.

*Id.* at 520.

Subsequently in *Payne v. Myers*, 743 P.2d 186, 188 (Utah 1987), this Court stated, "*Prior to the 1978 amendment* [to the Governmental Immunity Act, which for the first time included a provision on official immunity], *the doctors, as governmental employees, had no immunity from suit for their simple negligence.*" (Emphasis added.) The position in *Payne* is consistent with sound authority from other states and Utah precedent going back to *Clinton, Richardson,* and *Benally.*

A principal rationale for official immunity is the protection of governmental decision making, whether it be at the top level or at some level below, from second-guessing by the courts. There is nothing whatsoever about the rendition of medical treatment that involves governmental decision making. As the court in *Davis v. Knud–Hansen Memorial Hospital,* 635 F.2d 179 (3d Cir.1980), stated:

> Reviewing the allegations of the complaint in this case, it is evident that plaintiff complains of negligent medical treatment by Dr. Coulam. Such allegations are generally agreed to implicate ministerial rather than discretionary conduct, which does not render the government doctor immune from liability. *Jackson v. Kelly,* 557 F.2d 735, 738 (10th Cir.1977); *Henderson v. Bluemink,* 511 F.2d 399, 402–03 (D.C.Cir.1974); *Spencer v. General Hospital of the District of Columbia,* 425 F.2d 479, 489 (D.C.Cir.1969) (en banc) (Wright, J., concurring). The distinction was aptly noted in the latter case, where it was observed, "This is not to say that the performance of an operation does not involve judgment and discretion. The point is that *medical,* not *governmental,* judgment and discretion are involved." *Id.*

*Id.* at 186.

In short, the discretion a doctor employs is not in any way "governmental" discretion, and his acts for purposes of official immunity are ministerial even though they involve some amount of discretion. This Court made that point explicit in *Frank v. State,* 613 P.2d 517 (Utah 1980), and it is entirely consistent with the principles stated in the early Utah cases of *Clinton* and *Richardson.*

This Court's holding in *Frank* and its dictum in *Payne* as to the inapplicability of official immunity to the actions of state-employed health care providers in the actual rendition of medical services accords with the vast weight of judicial authority: actual *medical treatment* is not entitled to immunity under the official immunity doctrine. A number of cases from other state and federal courts hold that a doctor's conduct in treating or diagnosing patients is ministerial and is not protected by official immunity. *See, e.g., Spencer v. General Hosp. of Dist. of Columbia,* 425 F.2d 479, 484 (1969) (Wright,

---

6. There is no doubt that the Court erred in referring to sovereign immunity with respect to individual liability early in the opinion. *Id.* at 518. That error was later corrected, however. *Id.* at

520. Sovereign immunity never applies to immunize individuals. It has always applied only to governmental agencies.

J., concurring); *Davis v. Knud–Hansen Memorial Hosp.*, 635 F.2d 179, 186 (3d Cir. 1980); *Jackson v. Kelly*, 557 F.2d 735, 739–40 (10th Cir.1977); *Moss v. Miller*, 254 Ill. App.3d 174, 192 Ill.Dec. 889, 625 N.E.2d 1044 (1993); *Kiersch v. Ogena*, 230 Ill.App.3d 57, 172 Ill.Dec. 335, 595 N.E.2d 696, *appeal denied*, 147 Ill.2d 627, 180 Ill.Dec. 150, 606 N.E.2d 1227 (1992); *Watson v. St. Annes Hosp.*, 68 Ill.App.3d 1048, 25 Ill.Dec. 411, 386 N.E.2d 885 (1979); *Gould v. O'Bannon*, 770 S.W.2d 220 (Ky.1989); *Kelley v. Rossi*, 395 Mass. 659, 481 N.E.2d 1340, 1344 n. 6 (1985); *Cooper v. Bowers*, 706 S.W.2d 542 (Mo.Ct. App.1986); *Kassen v. Hatley*, 887 S.W.2d 4 (Tex.1994); *James v. Jane*, 221 Va. 43, 282 S.E.2d 864 (1980).

It is, of course, inconsistent to hold, as the majority does, that a physician's treatment of a patient in a state hospital is ministerial but that when a physician treats a prisoner, that treatment is discretionary. There is no analytical basis, in my view, that justifies this inconsistency. Cases from other jurisdictions adhere to logic and consistency and hold that a prison doctor's treatment of a prisoner is ministerial and that the doctor is not entitled to official immunity for malpractice committed on a prisoner. *Moss v. Miller*, 254 Ill.App.3d 174, 192 Ill.Dec. 889, 625 N.E.2d 1044 (1993), for example, held that a prison physician was not protected from a malpractice action by official immunity because "[t]he duties the State-employed physicians allegedly breached were those every physician owes one's patient, rather than obligations incurred solely by virtue of holding a public office." *Id.*, 192 Ill.Dec. at 894, 625 N.E.2d at 1049. Likewise, *Cooper v. Bowers*, 706 S.W.2d 542, 542–43 (Mo.Ct.App.1986), held that because the treatment of patients in a government facility does not involve a governing function, a prison physician had no immunity from a malpractice suit. *See also*

State ex rel. Williams v. Adams*, 288 N.C. 501, 219 S.E.2d 198 (1975) (failure to provide medical aid to prisoner held actionable); *Neal v. Donahue*, 611 P.2d 1125 (Okla.1980) (doctor held liable for release of dangerous juvenile; superintendent of facility, i.e., supervisory official, held not liable).

The majority places great reliance on *Schmidt v. Adams*, 211 Ga.App. 156, 438 S.E.2d 659 (1993), which I submit rests on a serious confusion of the doctrines of sovereign immunity and official immunity. The majority quotes extensively from the opinion: the physician's assistant's "primary concern and duty is the *governmental function* of caring for persons confined in jail"; his actions "clearly were undertaken in his official capacity and as part of a *governmental function*." (Emphasis added.) *Schmidt* focused on the nature of a defendant's activity as being a governmental function, while neglecting the discretionary or ministerial nature of the act. . A *governmental* function analysis is simply not the correct analytical model to resolve questions of official immunity.[7] For example, *Connell v. Tooele City*, 572 P.2d 697 (Utah 1977), held that a court clerk was liable for failing to docket the payment of a fine, and because the activity was a ministerial function, albeit a governmental function also, the clerk had no immunity.

On the broader but closely related issue of immunity for physicians employed by state facilities other than prisons, the Supreme Court of Texas held that "government-employed medical personnel are not immune from tort liability if the character of the discretion they exercise is medical and not governmental." *Kassen v. Hatley*, 887 S.W.2d 4, 11 (Tex.1994). The court stated that while the allocation of medical resources is a discretionary act, actual treatment is ministerial, and once treatment is undertaken, state health care professionals owe their

---

7. The majority fails to recognize the distinction between sovereign immunity and official immunity. While the former is an ancient doctrine applicable to states and other governmental entities, the latter is a relatively new innovation and applies only to certain public officials. *See* George A. Bermann, *Integrating Governmental and Officer Tort Liability*, 77 Colum.L.Rev. 1179 (1977). These two types of immunity are grounded in different policy interests and employ

different standards. During the course of its analysis, the majority erroneously applies sovereign immunity standards to decide the issue of official immunity. *See generally DeBry v. Noble*, 889 P.2d 428, 432–34 (Utah 1995); *Standiford v. Salt Lake City*, 605 P.2d 1230, 1235–36 (Utah 1980). In contrast, we apply the ministerial/discretionary function test to questions of official immunity.

patients the same duty that private medical professionals owe theirs. *Id.* at 10. The Supreme Court of Virginia reached the same result and held that attending staff at a state hospital were not immune from a negligence suit. *James v. Jane,* 221 Va. 43, 282 S.E.2d 864, 870 (1980).

The fact is that the law in almost every other jurisdiction is to the same effect. *See, e.g., Davis v. Knud–Hansen Memorial Hosp.,* 635 F.2d 179, 186 (3d Cir.1980); *Jackson v. Kelly,* 557 F.2d 735, 739–40 (10th Cir.1977);[8] *Kiersch v. Ogena,* 230 Ill.App.3d 57, 172 Ill.Dec. 335, 340, 595 N.E.2d 696, 701, *appeal denied,* 147 Ill.2d 627, 180 Ill.Dec. 150, 606 N.E.2d 1227 (1992); *Watson v. St. Annes Hosp.,* 68 Ill.App.3d 1048, 25 Ill.Dec. 411, 415–16, 386 N.E.2d 885, 889–90 (1979); *Gould v. O'Bannon,* 770 S.W.2d 220, 222 (Ky.1989); *Kelley v. Rossi,* 395 Mass. 659, 481 N.E.2d 1340, 1344 n. 6 (1985).

The majority cites cases from other jurisdictions which it asserts support its decision. Most of the cases concern the liability of medical personnel engaged in supervisory administrative functions who were not involved in the treatment of patients. For example, the majority relies on *Estate of Burks v. Ross,* 438 F.2d 230 (6th Cir.1971), which held *supervisory* psychiatric personnel immune from negligence actions because they exercised only discretionary duties. The majority fails to state, however, that *Burks* also held hospital staff members liable

because their treatment of patients constituted a ministerial function. *Burks* is flatly contrary to the Court's position.

The other three cases which the majority relies upon all involve psychiatric malpractice that allegedly resulted in a patient committing suicide or upon release harming a third party. In such cases, the tort duty imposed on the psychiatrist is different because of the extremely difficult discretionary decisions that must be made.[9] *Smith v. Arnold,* 564 So.2d 873 (Ala.1990); *Canon v. Thumudo,* 430 Mich. 326, 422 N.W.2d 688 (1988); *Baker v. Straumfjord,* 10 Or.App. 414, 500 P.2d 496 (1972).

The rule is also well-established that a negligent failure to provide medical care to a prisoner known to be in need of such care is actionable against the sheriff and his surety. *Mississippi v. Durham,* 444 F.2d 152 (5th Cir.1971); *Magenheimer v. State,* 120 Ind. App. 128, 90 N.E.2d 813 (1950); *Farmer v. State,* 224 Miss. 96, 79 So.2d 528 (1955); *LaVigne v. Allen,* 36 A.D.2d 981, 321 N.Y.S.2d 179 (1971); *State ex rel. Williams v. Adams,* 288 N.C. 501, 219 S.E.2d 198 (1975); *State v. National Sur. Co.,* 162 Tenn. 547, 39 S.W.2d 581 (1931); *Smith v. Slack,* 125 W.Va. 812, 26 S.E.2d 387 (W.V.1943); M.L. Schellenger, Annotation, *Civil Liability of Sheriff or Other Officer Charged with Keeping Jail or Prison for Death or Injury of Prisoner,* 14 A.L.R.2d 353 (1950).

---

**8.** *Jackson* held that the official immunity doctrine did not protect an Air Force physician who was negligent in the treatment of the plaintiff from a malpractice suit. The court stated that *Doe v. McMillan,* 412 U.S. 306, 319, 93 S.Ct. 2018, 2028, 36 L.Ed.2d 912 (1973), required a careful inquiry into the scope of the alleged wrongful acts in view of the accused official's duties. Under that case, the test is whether the defendant was engaged in a discretionary function, that is, "whether defendant's duties were discretionary, to determine whether defendant is immune from personal liability for acts within the scope of his authority." *Jackson,* 557 F.2d at 737. The court stated:

> Generally speaking, a duty is discretionary if it involves judgment, planning, or policy decisions. It is not discretionary if it involves enforcement or administration of a mandatory duty at the operational level, even if professional expert evaluation is required. The key is whether the duty is mandatory or whether

the act complained of involved policy making or judgment.

*Id.* at 737–38 (citations omitted). The court stated further:

> This court has twice held that the discretionary function exception does not except the government from liability for negligent medical care. In *Griggs v. United States,* [178 F.2d 1, 3 (10th Cir.1949)], an army officer died while under treatment in an army hospital and it was alleged the death was caused by the negligent, careless, and unskillful acts of army personnel. We held the discretionary function exception did not apply to medical treatment because it is manifestly plain that the alleged acts of negligence, while involving skill and training, were non-discretionary. *Id.* at 738; *see also United States v. Gray,* 199 F.2d 239 (10th Cir. 1952).

**9.** I do not wish to endorse the practice of distinguishing psychiatric treatment from medical but only to note that the practice does exist.

**1176**

Finally, it is worth noting that prison physicians are in much the same situation as public defenders with respect to manipulation and harassment. Both are paid by the government and serve the needs of incarcerated persons who often harbor deep frustrations and animosities. Both draw on professional knowledge to render critical decisions related to the prisoner's interests. Yet the United States acknowledged that under common law, public defenders enjoy no immunity from malpractice actions. *See Ferri v. Ackerman*, 444 U.S. 193, 205, 100 S.Ct. 402, 409–10, 62 L.Ed.2d 355 (1979). As a unanimous United States Supreme Court observed, the duty of the public defender "is not to the public at large, except in that general way. His principal responsibility is to serve the undivided interests of his client." *Id.* at 204, 100 S.Ct. at 409. This fact distinguishes him from the judge, the prosecutor, and most other public officials. *Id.* at 202–03, 100 S.Ct. at 408–09. The same is true with respect to a prison physician.

As applied here, therefore, section 63–30–4 is unconstitutional because it deprives Ross of a remedy by due course of law for an injury to his person in violation of article I, section 11 of the Utah Constitution. *Berry v. Beech Aircraft*, 717 P.2d 670 (Utah 1985); *Horton v. Goldminer's Daughter*, 785 P.2d 1087 (1989); *Payne v. Myers*, 743 P.2d 186 (Utah 1987). I also submit that section 63–30–4 violates article I, section 24 of the Utah Constitution because the patent discrimination between medical care standards applied to prisoners and those applied to other patients in state institutions is clearly not necessary, let alone effective, in promoting a rational prison objective. *Lee v. Gaufin*, 867 P.2d 572, 579 (Utah 1993); *Malan v. Lewis*, 693 P.2d 661, 669–70 (Utah 1984).

DURHAM, J., concurs.